## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  HON. JENNIFER CHOE-GROVES, *JUDGE*

| | |
|---|---|
| KEYSTONE AUTOMOTIVE OPERATIONS, INC., : | |
| : | |
| Plaintiff,                    : | Court No. 21-00215 |
| : | |
| v.                            : | |
| : | |
| UNITED STATES,                 : | |
| : | |
| Defendant.                : | |
| : | |

## <u>ORDER</u>

Upon reading plaintiff's motion for summary judgment; defendant's cross-motion for summary judgment; plaintiff's response and reply; defendant's reply; and upon consideration of other papers and proceedings had herein, it is hereby

**ORDERED** that plaintiff's motion for summary judgment be, and hereby is, denied; and it is further

**ORDERED** that defendant's cross-motion for summary judgment be, and hereby is, granted; and it is further

**ORDERED** that the imported merchandise is properly classified under primary subheading 8708.29.5060 of the Harmonized Tariff Schedule of the United States (HTSUS), and under secondary heading 9903.88.03, HTSUS; and it is further

**ORDERED** that judgment is entered for defendant and this action be, and hereby is, dismissed.

_____
JENNIFER CHOE-GROVES, *JUDGE*

Dated: New York, New York
This _____ day of _____, 2024

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. JENNIFER CHOE-GROVES, *JUDGE*

| | | |
|---|---|---|
| KEYSTONE AUTOMOTIVE OPERATIONS, INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 21-00215 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*:                                    BRANDON A. KENNEDY
Valerie Sorensen-Clark                  Trial Attorney
General Attorney                            Civil Division, U.S. Dept. of Justice
Office of the Assistant Chief Counsel   Commercial Litigation Branch
International Trade Litigation          26 Federal Plaza, Room 346
U.S. Customs and Border Protection   New York, New York 10278
New York, New York 10278              Tel.: (212) 264-9230
                                                      *Attorneys for Defendant*

Dated: February 16, 2024

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

QUESTION PRESENTED ................................................................................................ 8

SUMMARY OF ARGUMENT ......................................................................................... 8

ARGUMENT ..................................................................................................................... 9

  I.   STANDARD OF REVIEW ....................................................................................... 9

  II.  LEGAL FRAMEWORK FOR TARIFF CLASSIFICATION ................................. 10

  III.  THE PRINCIPAL USE OF KEYSTONE'S STEP BARS IS AS STEPS FOR EASING ENTRY INTO AND EXIT FROM A HIGH ROAD CLEARANCE VEHICLE'S CAB, AND THEREFORE ARE NOT "SIDE PROTECTIVE ATTACHMENTS" ................ 13

      a.  The General Physical Characteristics Of The Merchandise .............................. 16

      b.  The Expectations Of The Ultimate Purchasers ................................................... 19

      c.  The Channels Of Trade In Which The Merchandise Moves .............................. 20

      d.  The Environment Of Sale ................................................................................... 21

      e.  Use In The Same Manner Which Defines The Class ......................................... 23

      f.  Economic Practicality Of The Specified Use ..................................................... 25

      g.  Recognition In The Trade Of The Specified Use ............................................... 26

  IV.  THE GRANT OF AN EXCLUSION TO ANOTHER IMPORTER'S MERCHANDISE IS NOT A FACTOR THAT THE COURT CONSIDERS FOR PURPOSES OF DETERMINING THE APPLICABILITY OF THE EXCLUSION .............................. 27

CONCLUSION ................................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................................... 9

*Aromont USA, Inc. v. United States*,
671 F.3d 1310 (Fed. Cir. 2012) ................................................................ 20, 26, 27

*Aves. In. Leather v. United States*,
423 F.3d 1326 (Fed. Cir. 2005) ................................................................................ 11

*BASF Corp. v. United States*,
482 F.3d 1324 (Fed. Cir. 2007) ............................................................................... 10

*Bausch & Lomb, Inc. v. United States*,
148 F.3d 1363 (Fed. Cir. 1998) ................................................................................. 9

*BenQ Am. Corp. v. United States*,
646 F.3d 1371 (Fed. Cir. 2011) ............................................................................... 12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................................................................... 9

*Clarendon Marketing, Inc. v. United States*,
144 F.3d 1464 (Fed. Cir. 1998) ............................................................................... 10

*Cummins Inc. v. United States*,
454 F.3d 1361 (Fed. Cir. 2006) ............................................................................... 12

*Dependable Packaging Solutions, Inc. v. United States*,
757 F.3d 1374 (Fed. Cir. 2014) ....................................................................... 16, 23

*Ford Motor Company v. United States*,
926 F.3d 741 (Fed. Cir. 2019) ................................................................................. 14

*Jarvis Clark Co. v. United States*,
733 F.2d 873 (Fed. Cir. 1984) ................................................................................. 10

*Jarvis Clark Co. v. United States*,
739 F.2d 628 (Fed. Cir. 1984) ................................................................................. 10

*Len-Ron Mfg. Co., Inc. v. United States*,
334 F.3d 1304 (Fed. Cir. 2003) ............................................................................... 13

*Link Snacks, Inc. v. United States*,
  742 F.3d 962 (Fed. Cir. 2014) ........................................................................ 12

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ......................................................................................... 9

*Nat'l Advanced Sys. V. United States*,
  26 F.3d 1107 (Fed. Cir. 1994) ........................................................................ 12

*Lenox Collections, a div. of Lenox, Inc. v. United States*,
  20 C.I.T. 194, 1996 WL 47155 (Ct. Int'l Trade 1996)..................................... 21

*Orlando Food Corp. v. United States*,
  140 F.3d 1437 (Fed. Cir. 1998) ........................................... 10, 13, 14, 15

*Phone-Mate, Inc. v. United States*,
  690 F.Supp. 1048 (Ct. Int'l Tr. 1988)
  *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) ............................................................. 9

*Pomeroy Collection, Ltd. v. United States*,
  559 F.Supp.2d 1374 (Ct. Int'l Trade 2008).................................................... 11

*SC Johnson & Son Inc. v. United States*,
  999 F.3d 1382 (Fed. Cir. 2021) ...................................................................... 14

*Stewart-Warner Corp. v. United States*,
  748 F.2d 663 (Fed. Cir. 1984) ........................................................................ 14

*Texas Apparel Co. v. United States,*
  698 F. Supp. 932 (Ct. Int'l Trade 1988),
  *aff'd* 883 F.2d 66 (Fed. Cir. 1989), *cert denied* 493 US 1024 (1990)....................... 9

*United States v. Carborundum Co.*,
  63 CCPA 98, 536 F.2d 373 (1976)................................................... *passim*

*United States v. Pan Pac. Textile Group Inc.*,
  276 F.Supp.2d 1316 (Ct. Int'l Tr. 2003) ........................................................ 10

*Warner-Lambert Co. v. United States*,
  407 F.3d 1207 (Fed. Cir. 2005) ................................................................ 13, 15

**Statutes**

19 U.S.C. § 1515(b) ............................................................................................ 3

19 U.S.C. § 2411(b)(1) ...................................................................................... 11

28 U.S.C. § 1581(a) ............................................................................................. 3

Section 301 of the Trade Act of 1974, Pub. L. 93-618, 19 U.S.C. § 2411 ................ 1, 2, 8, 11, 12

**Regulations**

19 C.F.R. § 174.22 ............................................................................................... 3

*Notice of Product Exclusions: China's Acts, Policies, and Practices*
*Related to Technology Transfer, Intellectual Property and Innovation,*
85 Fed. Reg. 23,122, 23,130 (Apr. 24, 2020) ........................................................ 2, 12

*Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices*
*Related to Technology Transfer, Intellectual Property and Innovation,*
85 Fed. Reg. 48,600, 48,616 (Aug. 11, 2020) (extending the exclusion at
issue from August 7, 2020 through December 31, 2020) ......................................... 3, 12, 27, 28

*Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices*
*Related to Technology Transfer, Intellectual Property and Innovation,*
84 Fed. Reg. 38,717 (Aug. 7, 2019)………………………………………………12

**Harmonized Tariff Schedule of the United States**

General Rule of Interpretation 1 ......................................................................... 10, 11, 13

Explanatory Note GRI 1 ..................................................................................... 10

General Rule of Interpretation 6 ......................................................................... 11

ARI 1(a) .............................................................................................................. 11, 15, 16

Chapter 87

    Heading 8701 ............................................................................................ 2

    Heading 8705 ............................................................................................ 2

    Heading 8708 ............................................................................................ 2

      Subheading 8708.29.50 ....................................................................... 2

      Subheading 8708.29.5060 ................................................................... 2, 8, 13

Chapter 99

U.S. Note 20(iii)(213), Subchapter III, Ch. 99, HTSUS ........................................ 2, 8, 13, 29

Note 20(f), Subchapter III to Chapter 99 ........................................................... 2

    Heading 9903 ............................................................................................ 2

        Subheading 9903.88.03 ........................................................................ 2

        Subheading 9903.88.56 ....................................................................2, 8

## Rules

USCIT Rule 56 ..................................................................................................... 1, 9

USCIT Rule 56(c) .................................................................................................. 9

## Other Authorities

U.S. Gov't Accountability Off, GAO-21-506,
   Report to Congressional Requesters: U.S. Trade 3 (2021) ..................................... 11

PROTECT, *Merriam Webster,*
available at https://www.merriam-webster.com/dictionary/protective ...................................15

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  HON. JENNIFER CHOE-GROVES, *JUDGE*

| | | |
|---|---|---|
| KEYSTONE AUTOMOTIVE OPERATIONS, INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 21-00215 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF LAW IN SUPPORT THEREOF AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade,
defendant, United States, cross moves for summary judgment, requesting that the Court
respectfully: (1) deny plaintiff's motion for summary judgment; (2) grant our motion for
summary judgment; (3) enter judgment for defendant and dismissing this action; and (4) grant
defendant such other and further relief as may be just and appropriate.  Summary judgment in
favor of defendant is appropriate because there are no genuine issues of material fact, and
defendant is entitled to judgment in its favor as a matter of law.

**INTRODUCTION**

This action involves the proper tariff classification of plaintiff's, Keystone Automotive
Operations, Inc. (Keystone), step bars, and whether they are covered by an exclusion from
additional 25 percent *ad valorem* duties assessed under Section 301 of the Trade Act of 1974
(Pub. L. 93-618, 19 U.S.C. § 2411) (Section 301).  This case concerns one entry (Entry No. 600-
1015721-6) filed with the port of Newark/New York on November 18, 2020.  U.S. Customs and
Border Protection (CBP or Customs) liquidated the entry on February 5, 2021, and subsequently

re-liquidated the entry on February 19, 2021.  Upon liquidation, CBP classified the subject imports under statistical subheading 8708.29.5060[1] of the Harmonized Tariff Schedule of the United States (HTSUS), as "Parts and accessories of the motor vehicles of headings 8701 to 8705: Other: Other: Other," which carries a consumption duty of 2.5 percent *ad valorem*.  CBP also classified the merchandise under secondary heading 9903.88.03, HTSUS, which carries an additional 25 percent *ad valorem* duties under Section 301.[2]

The parties agree that the subject imports are first classified under subheading 8708.29.5060, HTSUS, as "Parts and accessories of the motor vehicles of headings 8701 to 8705: Other: Other: Other."  However, the parties disagree as to the proper secondary heading for the imported products, which pertains to the Section 301 duties.

Keystone claims that the merchandise qualifies for an exclusion from Section 301 duties, such that they are classified under secondary heading 9903.88.56, HTSUS, which covers "[t]ire carrier attachments, roof racks, fender liners, side protective attachments, the foregoing of steel (described in statistical reporting number 8708.29.5060)."  *See* U.S. Note 20(iii)(213), Subchapter III, Ch. 99, HTSUS; *see also Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 85 Fed. Reg. 23,122, 23,130 (Apr. 24, 2020) (establishing the exclusion at issue); *Notice of Product*

---

[1] The 9th and 10th digits of the HTSUS provision (and accompanying text) comprise the statistical suffix to the provision and are not statutory.  We nevertheless include them here because they are relevant to plaintiff's claim that the subject merchandise is excluded from Section 301 duties, as discussed below.

[2] Note 20(f), Subchapter III to Chapter 99, states that "Heading 9903.88.03 applies to all products of China that are classified in the following 8-digit subheadings, except products of China granted an exclusion by the U.S. Trade Representative . . ."  Subheading 8708.29.50 is one of the enumerated tariff provisions.  Heading 9903.88.03 imposes a duty rate of 25 percent *ad valorem* in addition to regular Customs duties.

*Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 85 Fed. Reg. 48,600, 48,616 (Aug. 11, 2020) (extending the exclusion at issue from August 7, 2020 through December 31, 2020).

On March 9, 2021, Keystone timely filed the protest at issue (Protest No. 4601-21-126305), along with an application for further review and a request for accelerated disposition under 19 U.S.C. § 1515(b) and 19 C.F.R. § 174.22.  CBP did not act on the protest within thirty days following the date of the mailing of the request for accelerated disposition, and the protest was therefore denied by operation of law on April 8, 2021.  Accordingly, plaintiff timely filed its summons on May 4, 2021.  All liquidated duties, taxes and charges were paid prior to plaintiff filing the summons.  Therefore, the Court has jurisdiction over this action under 28 U.S.C. § 1581(a).

At issue now is whether an exclusion applies to Keystone's step bars.  The undisputed facts show that all of Keystone's imported products consist of rubberized plastic steps mounted on steel bars that attach to the sides of vehicles and whose primary function and use are assisting an individual in entering and exiting a high road clearance vehicle by stepping on the step pads.  As such, the products do not meet the exclusion's description of steel "side protective attachments."  The parties have engaged in factual discovery of the imported merchandise such that no genuine disputes remain as to the facts that are material to the resolution of this action.

## STATEMENT OF FACTS

Keystone uses the terms "step bars," "side steps," "nerf bars," and "side bars" interchangeably to describe the subject merchandise.  Def. Statement of Material Facts as to Which There Are No Issues to Be Tried (Def. SOF), ¶ 1 (*see also* Pl. Ex. D, at 14:4-11, 46:6-14, and 115:21-117:4).  Nerf bars and running boards are "essential for those who want a safe area to

3

step onto while exiting or entering a pick-up truck."  Def. SOF, ¶ 2 (*see also* ECF No. 9-1, at

65).  Nerf bars provide "a stepping surface on the entry points of your truck but can also extend

from wheel to wheel."  Def. SOF, ¶ 3 (*see also* ECF No. 9-1, at 66).  "Much like running

boards," nerf bars "also have the same function – allowing you to get in or out of the truck and

wiping off dirt from your shoes."  Def. SOF, ¶ 4 (*see also* ECF No. 9-1, at 69).  Nerf bars and

running boards are "truck step options."  Def. SOF, ¶ 5 (*see also* ECF No. 9-1, at 75).  "Running

boards or footboards provide an accessible step for people who are entering and exiting pickup

trucks and other taller vehicles."  Def. SOF, ¶ 6 (*see also* ECF No. 9-1, at 76).  "The nerf bar has

its origins in the world of racing."  Def. SOF, ¶ 7 (*see also* ECF No. 9-1, at 77).  However, "[t]he

nerf bar has since been adopted for other applications, specifically for trucks and SUVs," and

"[m]uch like the running board, it serves as a lowered step to make it easier to get in and out of

lifted vehicles."  Def. SOF, ¶ 8 (*see also* ECF No. 9-1, at 77).  "A side bar's primary function is

to provide a stepping surface into the vehicle."  Def. SOF, ¶ 22 (*see also* Def. Ex. 7, Aries

Automotive, *Side Bars vs. Running Boards*, *available at* https://www.ariesautomotive.com/side-

bars-vs-running-boards (last viewed Feb. 13, 2024)).  Side bars that lack steps involve "a totally

different design" and are "more for rock crawling and aggressive or more aggressive

applications" as compared to the step bars imported by Keystone.  Def. SOF, ¶¶ 9-10 (*see also*

Def. Ex. 1, Fabbro Depo., at 23:12-20, 23:20-22).[3]

---

[3] 12 Q. And what are the differences, then?
13 A. The differences between?
14 Q. Between these step bars and then just
15 removing the step features or the bars that Keystone
16 sells without steps.
17 A. There would be, you know, a big
18 difference. There could be a big difference.
19 Typically, without steps, it's a totally different

All of Keystone's step bars consist of rubberized plastic step features (step pads) mounted on steel tubes.  Def. Resp. to Pl. Statement of Undisputed Facts (Def. Resp.), ¶¶ 12, 19. Keystone's step bars are designed to attach to the frame on either side of high road clearance vehicles, such as trucks and Jeeps.  Def. SOF, ¶¶ 11-13 (*see also* Def. Ex. 2, Pl.'s Resp. to Def.'s First Req. for Prod., No. 5; Def. Exs. 3-4, at 6 (submitted by plaintiff in response to Def.'s Req. for Prod. No. 5)); Def. Resp. ¶ 16.  Keystone submitted Patent Nos. US7416202B2 and US7717444B2, which "relate to products substantially identical to the imported products[.]" Def. SOF, ¶ 11 (*see also* Def. Ex. 2, Pl.'s Resp. to Def.'s First Req. for Prod., No. 5).  Patent No. US 7416202B2, for "Apparatus for Assisting Entry into High Road Clearance Vehicles," states that "[t]he primary object of the invention is assists entry into vehicle passenger compartment." Def. SOF, ¶ 12 (*see also* Def. Ex. 3, at 6 (submitted by plaintiff in response to Def.'s Req. for Prod. No. 5)).  Patent No. US 7717444 B2, for "Apparatus for assisting entry into high road clearance vehicles," states that "[t]he primary object of the invention is assists entry into vehicle passenger compartment."  Def. SOF, ¶ 13 (*see also* Def. Ex. 3, at 6 (submitted by plaintiff in response to Def.'s Req. for Prod. No. 5)).

On the online product page for the TrailFX A1005B, Keystone describes it as a "side step," "step bar," "step," "step product," and "step type."  Def. SOF, ¶ 15 (*see also* Pl. Ex. B-1, at 55).  Keystone identifies a purported expert witness, Mr. Stephen Kozak[4], in support of its claims.  Mr. Kozak testified that Keystone's online product page for the TrailFX A1005B markets the product in a way that indicates its primary purpose is to provide the slip resistant

---

20 design. That sits closer to the vehicle, more for
21 rock crawling and aggressive or more aggressive
22 applications.
4 Mr. Kozak is President of Kozak Implementation Specialist, a single-person LLC, licensed in Michigan.

stepping entry and exit points to the cab of the vehicle.  Def. SOF, ¶ 16 (*see also* Def. Ex. 5, Kozak Depo., at 83:1-10, 85:15-24; Pl. Ex. B-1, at 55).[5]  Keystone's customers are able to access Keystone's online product pages to read the product descriptions, refer to the product pictures, decide if they want to purchase the products, and/or help them purchase the products.  Def. SOF, ¶ 17 (*see also* Def. Ex. 1, Fabbro Depo., at 71:12-18).  On the online product page for the TrailFX A1005B, Keystone describes the TrailFX steps as providing a maximum weight capacity of 300 pounds, which reflects the maximum weight of a person that the steps can bear, as providing "a sleek and stylish look," and as providing "moderate protection against road hazards and debris."  Def. SOF, ¶¶ 23-25 (*see also* Pl. Ex. B-1, at 55; Def. Ex. 1, Fabbro Depo., at 75:3-16).  The protection afforded by the subject merchandise, such as product style TrailFX A1005B, is "not the primary" feature, purpose, or function of the subject merchandise.  Def. SOF, ¶ 14 (*see also* Def. Ex. 1, Fabbro Depo., at 78:23-79:11, 69:3-22).[6]

---

[5] 15 Q. Okay. Now, considering what we've discussed today
16 and the product info that we just discussed and read
17 out loud, isn't it fair to say that the primary
18 purpose of these TrailFX step bars is to provide the
19 slip resistant stepping entry and exit points to the
20 cab of the vehicle?
21 MR. KIYASOV: Objection, calls for
22 speculation.
23 THE WITNESS: That's how they are being
24 marketed by the -- in this brochure here.
[6] Q. So, now, given everything we've discussed
24 about this product style, the product info, the
Page 78
1 features, all of the descriptors, and the fact that
2 it's the fifth bullet point that says "provides
3 moderate protection against road hazards and
4 debris," is it fair to say that this moderate
5 protection that is provided by this product is not
6 the primary feature or purpose or function of this
7 product style here?

Keystone looks at customers' social media to ascertain how they are using the subject merchandise.  Def. SOF, ¶ 18 (*see also* Def. Ex. 1, Fabbro Depo., at 95:5-12).  Keystone is responsible for a Facebook page for TrailFX products.  Def. SOF, ¶ 19 (*see also* Def. Ex. 6, at 1, *also available at* https://www.facebook.com/TrailFX/, last viewed Feb. 13, 2024).  Defendant's Exhibit 6 includes all posts managed by Keystone and published to this TrailFX Facebook page from January 2023, through January 26, 2024, that features the same, or substantially similar, products as those at issue in this case.  Def. SOF, ¶ 20 (*see also* Def. Ex. 6).  Exhibit 6 shows that the majority of the posts, all of which are published by Keystone, describe Keystone's products as steps, step bars, step boards, or side steps.  Def. SOF, ¶ 21 (*see also* Def. Ex. 6).

Keystone does not have any specific data or metrics showing what percentage of customers use the subject merchandise in a certain way or how often they use it.  Def. SOF, ¶ 26 (*see also* Def. Ex. 1, Fabbro Depo., at 95:2-17).

Keystone's imported products are sold online via various websites and in physical retail locations and showrooms.  Def. SOF, ¶ 27 (*see also* Def. Ex. 8).  A&A Auto Stores sells Keystone's imported products, as well as various other auto parts, on its website (https://www.aaautostores.com/).  Def. SOF, ¶ 28 (*see also* Def. Ex. 8).  The A&A Auto Stores website does not sell Keystone's imported products in the "Vehicle Protection" sub-category of the Products>Exterior category (https://www.aaautostores.com/products/exterior/vehicle-protection).  Def. SOF, ¶ 29 (*see also* Def. Ex. 9).  The A&A Auto Stores website sells "nerf bars" and "steps" in the "Nerf Bars & Steps" sub-category of the Products>Exterior category

---

8 A. I think the way it's presented it's not
9 the primary, but it is an element of the feature of
10 this product. In this particular case, we're not
11 emphasizing that.

(https://www.aaautostores.com/products/exterior/nerf-bars-steps).  Def. SOF, ¶ 30 (*see also* Def.

Ex. 10).  The A&A Auto Stores website displays "nerf bars," "steps," "step bars," "side steps,"

and "side step bars" under the "Nerf Bar" sub-category of the Products>Exterior>Nerf Bars &

Steps sub-category (https://www.aaautostores.com/products/exterior/nerf-bars-steps).  Def. SOF,

¶ 31 (*see also* Def. Ex. 11).

## QUESTION PRESENTED

1.   Whether Keystone's step bars, which consist of rubberized plastic step pads mounted on

steel tubes and whose principal use is as step bars or side step attachments, qualify for an

exclusion for "[t]ire carrier attachments, roof racks, fender liners, side protective attachments, the

foregoing of steel (described in statistical reporting number 8708.29.5060)" that is provided for

in U.S. Note 20(iii)(213) to Subchapter III of Chapter 99, HTSUS.

## SUMMARY OF ARGUMENT

Summary judgment for the Government is warranted.  The primary legal question in this

action is whether the imported step bars qualify for an exclusion from the assessment of Section

301 duties by being classified under secondary heading 9903.88.56, HTSUS.  The exclusion

covers, in relevant part, "side protective attachments, the foregoing of steel (described in

statistical reporting number 8708.29.5060)."  By its express language, the exclusion only applies

to merchandise that is classifiable in statistical reporting number 8708.29.5060, HTSUS, and

which meets the product description set forth in the exclusion at secondary heading 9903.88.56,

HTSUS.  While Keystone's step bars are classified under primary subheading 8708.29.5060,

HTSUS, the step bars are not classified under secondary heading 9903.88.56, HTSUS, because

they are not side protective attachments.

The undisputed facts show that Keystone's imported products are step bars, also known as truck steps, side steps, or side step attachments, composed of rubberized plastic step pads mounted atop steel bars, whose primary function and use are to assist an individual in entering and exiting a high road clearance vehicle by stepping on the step pads, such that they do not meet the exclusion's description of steel "side protective attachments."

## ARGUMENT

### I.      STANDARD OF REVIEW

Under USCIT Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  On a motion for summary judgment, the Court determines whether there are any factual disputes that are material to the resolution of the action.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Texas Apparel Co. v. United States*, 698 F.Supp. 932, 934 (Ct. Int'l Tr. 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) (citations omitted).  "The court may not resolve or try factual issues on a motion for summary judgment." *Phone-Mate, Inc. v. United States*, 690 F.Supp. 1048, 1050 (Ct. Int'l Tr. 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) (citation omitted).  In determining whether a genuine issue of fact exists, the Court reviews the evidence submitted, drawing all inferences against the moving party.  *See United States v. Pan Pac. Textile Group Inc.*, 276 F.Supp.2d 1316, 1319 (Ct. Int'l Tr. 2003); *Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This Court may resolve a classification issue by means of summary judgment.  *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  Summary

judgment is appropriate where the nature of the merchandise is not in question and the sole issue before the court is the proper classification of the merchandise. *See id.* In the absence of genuine factual issues, the propriety of summary judgment turns on the proper construction of the HTSUS, which is a question of law. *See Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464, 1466 (Fed. Cir. 1998). Here, given the parties' Joint SOF, there are no facts in dispute to preclude summary judgment in favor of the Government.

The Court "must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984). Although the Court must satisfy itself that CBP's classification is correct, a plaintiff still must overcome the presumption of correctness and provide sufficient evidence to prove that CBP's classification is incorrect. *See Jarvis Clark Co. v. United States*, 739 F.2d 628, 630 (Fed. Cir. 1984).

## II.    LEGAL FRAMEWORK FOR TARIFF CLASSIFICATION

Merchandise imported into the United States is classified under the HTSUS. The tariff classification of merchandise under the HTSUS is governed by the principles set forth in the General Rules of Interpretation (GRIs) and the Additional U.S. Rules of Interpretation (ARIs). *See Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998); *BASF Corp. v. United States*, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007).

GRI 1 provides, in relevant part, that "for legal purposes, classification shall be determined according to the terms of the headings and any relative Section or Chapter Notes and, provided such headings or Notes do not otherwise require, according to the {remaining GRIs.}" As interpreted by its Explanatory Note, GRI 1 establishes that "the terms of the headings and any relative section or Chapter Notes are paramount, *i.e.*, they are the first consideration in

10

determining classification." *See also The Pomeroy Collection, Ltd. v. United States*, 559

F.Supp.2d 1374, 1385 (Ct. Int'l Trade 2008).  GRI 6 extends the principles of GRI 1 to the

subheading level.  The HTSUS section and chapter notes "are not optional interpretive rules,"

but instead have the force of statutory law.  *Aves. In Leather, Inc. v. United States*, 423 F.3d

1326, 1333 (Fed. Cir. 2005) (internal quotation marks omitted).  Further, principal use provisions

are governed by ARI 1(a): "[A] tariff classification controlled by use (other than actual use) is to

be determined in accordance with the use in the United States at, or immediately prior to, the

date of importation, of goods of that class or kind to which the imported goods belong, and the

controlling use is the principal use."

Section 301 of the U.S. Trade Act of 1974, 19 U.S.C. § 2411 (Section 301) authorizes the

President and USTR to take action to eliminate certain acts, policies, or practices of a foreign

government that burden U.S. commerce.  *See* 19 U.S.C. § 2411.  The statute grants USTR

discretionary authority to determine that "an act, policy, or practice of a foreign country is

unreasonable or discriminatory and burdens or restricts United States commerce" and to take

action as appropriate.  *Id.* at Section 2411(b)(1).  Under this authority, in August 2017, USTR

began investigating certain trade practices of the People's Republic of China.  USTR found that

some of those trade practices "related to intellectual property, innovation, and technology were

unreasonable or discriminatory, and burden[ed] or restrict[ed] U.S. commerce."  U.S. Gov't

Accountability Off, GAO-21-506, Report to Congressional Requesters: U.S. Trade 3 (2021)).

"To help obtain the elimination of" those trade practices, USTR, "at the direction of the

President, placed additional tariffs on certain products from China starting in July 2018."  *Id.*

at 1.  USTR issued four lists of product categories subject to the new tariffs.  Relevant to this

action, USTR imposed a 25% tariff on List 1 product categories effective with respect to goods

entered for consumption, or withdrawn from warehouse for consumption, on or after July 6, 2018.

USTR established a process by which interested persons may request that particular products classified under a tariff subheading subject to Section 301 duties be excluded from those duties.  *See Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 85 Fed. Reg. 23,122, 23,130 (Apr. 24, 2020) (establishing the exclusion at issue); *Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 85 Fed. Reg. 48,600, 48,616 (Aug. 11, 2020) (extending the exclusion at issue from August 7, 2020 through December 31, 2020).  The exclusions were "product specific" and were available for any product that meets the description, "regardless of whether the importer filed an exclusion request."  *See* 84 Fed. Reg. 38,717 (Aug. 7, 2019).

The determination of whether a particular product falls within a tariff classification—including as in this case, a provision for an exclusion—is a two-step process: first, the meaning of terms within the provision must be ascertained, and second, a determination must be made as to whether the merchandise at issue falls within the description of such terms as properly construed.  *See Nat'l Advanced Sys. V. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994). "When there is no dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'"  *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965-66 (Fed. Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

Where relevant terms are undefined in the tariff statute, they "are [to be] construed according to their common [and] commercial meanings."  *BenQ Am. Corp. v. United States*, 646

F.3d 1371, 1376 (Fed. Cir. 2011) (internal quotation marks omitted).  To ascertain the "common [and] commercial meanings" of a particular tariff term, the Court "may rely on its own understanding of the term as well as upon lexicographic and scientific authorities."  *Len-Ron Mfg. Co., Inc. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  That is, the "court may consult dictionaries, scientific authorities, and other reliable information sources."  *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

## III.   THE PRINCIPAL USE OF KEYSTONE'S STEP BARS IS AS STEPS FOR EASING ENTRY INTO AND EXIT FROM A HIGH ROAD CLEARANCE VEHICLE'S CAB, AND THEREFORE ARE NOT "SIDE PROTECTIVE ATTACHMENTS"

The question presented is whether, pursuant to GRI 1, the step bars are described by the term "side protective attachments" provided for in U.S. Note 20(iii)(213) to Subchapter III of Chapter 99, HTSUS.  As we demonstrative below, the imported merchandise does not qualify as "side protective attachments" or for the exclusion because the principal use of the imported merchandise is as steps for entering and exiting a high road clearance vehicle's cab, and not for protection.

U.S. Note 20(iii)(213) to Subchapter III of Chapter 99, HTSUS provides for "[t]ire carrier attachments, roof racks, fender liners, side protective attachments, the foregoing of steel (described in statistical reporting number 8708.29.5060)."  It is undisputed that the subject merchandise consists of parts and accessories of motor vehicles of 8708.29.5060, HTSUS. However, the exclusion at issue covers a subset of very specific parts and accessories of motor vehicles.

An *eo nomine* provision "describes a commodity by a specific name, usually one common in commerce."  *Orlando*, 140 F.3d at 1441.  The relevant portion of the exclusion for purposes of the subject merchandise at issue, "side protective attachments," is not an *eo nomine*

provision because it does not describe a commodity by a specific name that is common in commerce. Indeed, there is no evidence in the record that shows that "side protective attachments" is a specific name for a commodity that is common in commerce. *See* Pl. Mot. for Summ. J. (Pl. Mot.), 11-16. In fact, plaintiff defined the phrase "side protective attachments" by defining each of its constituent terms separately. *See id.*

Given all the above, the phrase "side protective attachments" must be understood as a principal use provision. *See Orlando*, 140 F.3d at 1441. Inherent in the term "protective," an adjectival form of the verb "protect," is the notion that the objects involved, *i.e.*, side protective attachments, are destined for a specific use, *i.e.*, protecting or providing protection. *See id.*; *Ford Motor Company v. United States*, 926 F.3d 741, 759 (Fed. Cir. 2019) (holding that HTSUS Heading 8704, which covers "motor vehicles *for the transport of goods*," "is a principal use provision because the heading identifies the chief use of the covered merchandise as of a kind used to transport goods") (emphasis in original). *SC Johnson & Son Inc. v. United States*, 999 F.3d 1382, 1389 (Fed. Cir. 2021) further confirms that "generic terms preceded by an adjective suggesting a manner of use can constitute principal use provisions." (citing *Stewart-Warner Corp. v. United States*, 748 F.2d 663, 667 (Fed. Cir. 1984) (explaining that the TSUS term encompassing "bicycle speedometers" was "a term 'controlled by use' . . . because the noun 'bicycle' acts as an adjective modifying 'speedometer' in a way that implies use of the speedometer on a bicycle")).

Therefore, as in *Orlando*, *Ford*, and *Stewart-Warner*, here too the terms of the provision identify the principal use of the covered merchandise as of a certain kind, *i.e.*, side protective attachments are side attachments of a kind principally used *to protect* or *for protection*. Specifically, as in *Stewart-Warner*, a generic term in the language of the provision, *i.e.*,

"attachment," is preceded by an adjective which inherently suggests a manner of use, *i.e.*, "protective." It therefore follows that other types of side attachments, such as side step attachments, whose principal use is not *protective*, do not meet the terms of the exclusion for "side protective attachments."

As plaintiff notes, the relevant definition from *Merriam-Webster* defines "protect" as "1a: to cover or shield from exposure, injury, damage, or destruction." Pl. Mot., 15; *see also Protect*, *available at* https://www.merriam-webster.com/dictionary/protective (last viewed Jan. 29, 2024). The inclusion of the term "protective" in the exclusion for "side protective attachments" clearly contemplates that the products falling within the exclusion's reach will be used principally to protect or for protection. *See Orlando*, 140 F.3d at 1441.

Also of relevance to this case is the definition of "side bar," given that Keystone uses the terms "step bars," "side steps," "nerf bars," and "side bars" interchangeably to describe the subject merchandise. Def. SOF, ¶ 1 (*see also* Pl. Ex. D, at 14:4-11, 46:6-14, and 115:21-117:4). In the automotive industry, the following definition and description of "side bar" can be found: "A side bar's primary function is to provide a stepping surface into the vehicle. For this reason, they are generally used on larger vehicles, such as pickup trucks and SUVs." Def. SOF, ¶ 22 (Def. Ex. 7, Aries Automotive, *Side Bars vs. Running Boards*, *available at* https://www.ariesautomotive.com/side-bars-vs-running-boards (last viewed Feb. 13, 2024), at 1); *see also Warner-Lambert*, 407 F.3d at 1209 (holding that the "court may consult dictionaries, scientific authorities, and other reliable information sources").

Principal use provisions are governed by ARI 1(a). "[A] tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the

imported goods belong, and the controlling use is the principal use."  ARI 1(a); *see also*

*Dependable Packaging Solutions, Inc. v. United States*, 757 F.3d 1374, 1379 (Fed. Cir. 2014).

Principal use provisions "call for a determination as to the group of goods that are commercially

fungible with the imported goods in order to identify the use which exceeds any

other *single* use."  *Id.* (emphasis in original) (internal citations omitted).  The Court must

consider the "*Carborundum* factors" in determining which goods are commercially fungible with

the imported goods.  *Id.* at 1380 (internal citations omitted); *see also United States v.*

*Carborundum Co.*, 63 CCPA 98, 536 F.2d 373, 377 (1976).  These factors include:

> [The] use in the same manner as merchandise which defines the
> class; the general physical characteristics of the merchandise; the
> economic practicality of so using the import; the expectation of the
> ultimate purchasers; the channels of trade in which the
> merchandise moves; the environment of the sale, such as
> accompanying accessories and the manner in which the
> merchandise is advertised and displayed; and the recognition in the
> trade of this use.

*Dependable*, 757 F.3d at 1380 (internal citations omitted).

Here, the application of the *Carborundum* factors demonstrates that Keystone's step bars

are not commercially fungible with "side protective attachments," but are instead commercially

fungible with other truck steps, step bars, side steps, running boards, and footboards which are

primarily used for facilitating entry into and exit from the vehicle cab of high road clearance

vehicles.  *See*, *e.g.*, *id.* at 1381 (holding that the trial court correctly concluded that the actual use

of the vases at issue was primarily decorative).

## A.  The General Physical Characteristics Of The Merchandise

The first *Carborundum* factor, "the general physical characteristics of the merchandise,"

shows that the step bars are not commercially fungible with "side protective attachments," but

instead, that they are commercially fungible with other bars or boards that feature stepping pads

or surfaces to facilitate the entry into and exit from high road clearance vehicles.  536 F.2d at 377.  First, Keystone uses the terms "step bars," "side steps," "nerf bars," and "side bars" interchangeably to describe the subject merchandise, and all of Keystone's step bars consist of rubberized plastic step features (step pads) mounted on steel tubes.  Def. SOF, ¶ 1 (*see also* Pl. Ex. D, at 14:4-11, 46:6-14, and 115:21-117:4); Def. Resp., ¶¶ 12, 19.  Second, the record contains evidence of other types of bars or boards with steps available for sale in the market and which are substantially similar to plaintiff's step bars, such as running boards and nerf bars with steps.  Indeed, the record shows that nerf bars are "essential for those who want a safe area to step onto while exiting or entering a pick-up truck," as they provide "a stepping surface on the entry points of [a] truck," and that "[m]uch like running boards, [nerf bars] also have the same function—allowing [an individual] to get in or out of the truck[.]"  Def. SOF, ¶¶ 2-4 (*see also* ECF No. 9-1, at 65-66, 69).  Both nerf bars and running boards are types of "truck step options," and "[r]unning boards or footboards provide an accessible step for people who are entering and exiting pickup trucks and other taller vehicles."  Def. SOF, ¶¶ 5-6 (*see also* ECF No. 9-1, at 75-76).  Although "[t]he nerf bar has its origins in the world of racing[,]" "[t]he nerf bar has since been adopted for other applications, specifically for trucks and SUVs[,]" and "[m]uch like the running board, it serves as a lowered step to make it easier to get in and out of lifted vehicles."  Def. SOF, ¶¶ 7-8 (*see also* ECF No. 9-1, at 77).  Similarly, "[a] side bar's primary function is to provide a stepping surface into the vehicle."  Def. SOF, ¶ 22 (*see also* Def. Ex. 7, Aries Automotive, *Side Bars vs. Running Boards*, *available at* https://www.ariesautomotive.com/side-bars-vs-running-boards (last viewed Feb. 13, 2024)).  Keystone's step bars are thus commercially fungible with products like running boards, nerf bars, and side bars that feature specialized stepping surfaces or pads, and not with "side protective attachments."

Third, in a general sense, side bars that lack steps involve "a totally different design" and are "more for rock crawling and aggressive or more aggressive applications" as compared to the step bars imported by Keystone.  Def. SOF, ¶¶ 9-10 (*see also* Def. Ex. 1, Fabbro Depo., at 23:12-22).  Because such bars without steps have a totally different design and thus, by definition, have different physical characteristics, those products are not commercially fungible with step bars that feature step pads or stepping surfaces.

Finally, Patent Nos. US7416202B2 and US7717444B2 submitted by Keystone, which relate to the design and physical characteristics of "products substantially identical to the imported products," indicate that "the primary object" of these inventions is "assist[ing] entry into [a] vehicle['s] passenger compartment."  Def. SOF, ¶¶ 11-13 (*see also* Def. Ex. 2, Pl.'s Resp. to Def.'s First Req. for Prod., No. 5; Def. Ex. 3, at 6; Def. Ex. 4, at 6).  In addition, Keystone's TrailFX steps provide a maximum weight capacity of 300 pounds, which reflects the maximum weight of a person that the steps can bear.  Def. SOF, ¶ 23 (*see also* Pl. Ex. B-1, at 55; Def. Ex. 1, Fabbro Depo., at 75:3-16).

 In this way, the designs of these products, specifically conceived for facilitating an individual's entry into and exit from a vehicle cab, strongly reflect physical characteristics such as step pads or specialized stepping surfaces, making these products commercially fungible with products like running boards, footboards, and nerf bars that also feature specialized stepping surfaces or pads.  In the same vein, this evidence show that the merchandise is not commercially fungible with side protective attachments.  As such, this factor supports a holding that the principal use of the step bars is for facilitating entry into and exit from a vehicle.

### B.  The Expectations Of The Ultimate Purchasers

The second *Carborundum* factor, "the expectations of the ultimate purchasers," also favors the conclusion that Keystone's step bars are primarily used for facilitating entry into and exit from high road clearance vehicles, and not commercially fungible with side protective attachments.  536 F.2d at 377.  The record is replete with evidence that retail purchasers buy step bars primarily for their design that features step pads and their ability to ease entry into and exit from a vehicle's cab.

On the online product page for the TrailFX A1005B, Keystone describes this step bar as a "side step," "step bar," "step," "step product," and "step type," *see* Def. SOF, ¶ 15 (Pl. Ex. B-1, at 55), thereby highlighting for customers the stepping features of the product.  In fact, Keystone's expert witness Mr. Kozak testified that Keystone's online product page for the TrailFX A1005B markets the product in a way that indicates its primary purpose is to provide the slip resistant stepping entry and exit points to the cab of the vehicle.  Def. SOF, ¶ 16 (*see also* Def. Ex. 5, Kozak Depo., at 83:1-10, 85:15-24; Pl. Ex. B-1, at 55).  Keystone designated Mr. Justin Fabbro, Keystone's Senior Director of Specialty Products Group, to testify on its behalf as its designated agent for the company.  Mr. Fabbro testified that Keystone's customers are in fact able to access Keystone's online product pages to read the product descriptions, refer to the product pictures, decide if they want to purchase the products, and/or help them purchase the products.  Def. SOF, ¶ 17 (*see also* Def. Ex. 1, Fabbro Depo., at 71:12-18).  Moreover, Keystone also looks at customers' social media to ascertain how they are using the subject merchandise.  Def. SOF, ¶ 18 (*see also* Def. Ex. 1, Fabbro Depo., at 95:5-12).  As such, the record evidence shows that customers' purchasing decisions are influenced by the manner in which Keystone

describes its products, and which features it highlights and emphasizes, in its online information—in this case, the step pads and stepping functions of the step bars.

Finally, Keystone is responsible for a Facebook page for TrailFX products.  Def. SOF, ¶ 19 (*see also* Def. Ex. 6, at 1).  Defendant's Exhibit 6 includes all posts managed by Keystone and published to this TrailFX Facebook page from January 2023, through January 26, 2024, that features the same, or substantially similar, products as those at issue in this case.  Def. SOF, ¶ 20 (*see also* Def. Ex. 6).  This exhibit shows that the majority of the posts, all of which are published by Keystone, describe Keystone's products as steps, step bars, step boards, or side steps.  Def. SOF, ¶ 21 (*see also* Def. Ex. 6).  Together, these facts show that Keystone places value on these descriptions of their step products, and that the expectation of the ultimate purchasers is to use these step bars for their stepping function.  As such, this factor also supports a holding that the principal use of the step bars is for easing entry into and exit from a vehicle.

### C.  The Channels Of Trade In Which The Merchandise Moves

The evidence for the third *Carborundum* factor, "the channels of trade in which the merchandise moves," *see* 536 F.2d at 377, shows that both step bars and side protective attachments move in similar channels of trade, as the evidence seems to show that both types of products can similarly be bought online or at auto part stores.  Def. SOF, ¶ 27 (*see also* Def. Ex. 8, "KAO WH, A&A Locations, Online Resources").  But these similarities have little probative value, given the fact that auto parts are generally sold through such channels.  Def. SOF, ¶¶ 27-29 (Def. Ex. 8; Def. Ex. 9); *see*, *e.g.*, *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1316 (Fed. Cir. 2012) (holding that the similarities in the channels of trade between the imported products and preparations for soups and broths proved little, given the fact that most food products are generally sold through such channels).

20

### D.  The Environment Of Sale

Fourth, "the environment of sale," *i.e.*, "accompanying accessories and the manner in which the merchandise is advertised and displayed," of the step bars, also supports a holding that the principal use of the step bars is for easing entry into and exit from a vehicle.  *Carborundum*, 536 F.2d at 377.  While there is no evidence regarding any accompanying accessories for the step bars and bars without steps, there is significant evidence regarding the manner in which the step bars are advertised.

As we explain above in Section III.B, Keystone advertises its step bars as "side steps," "step bars," "steps," "step products," and "step types," *see* Def. SOF, ¶ 15 (*see also* Pl. Ex. B-1, at 55), thereby showcasing the stepping features to its customers.  Keystone also markets its step bars in a way that indicates that its primary purpose is to provide the slip resistant stepping entry and exit points to the cab of the vehicle.  Def. SOF, ¶ 16 (*see also* Def. Ex. 5, Kozak Depo., at 83:1-10, 85:15-24; *see also* Pl. Ex. B-1, at 55).  And Keystone's customers are in fact able to access Keystone's online product pages to read the product descriptions, refer to the product pictures, decide if they want to purchase the products, and/or help them purchase the products. Def. SOF, ¶ 17 (*see also* Def. Ex. 1, Fabbro Depo., at 71:12-18).  And as we noted, Keystone also looks at customers' social media to ascertain how they are using the subject merchandise. Def. SOF, ¶ 18 (*see also* Def. Ex. 1, Fabbro Depo., at 95:5-12).  Together, these facts show that Keystone desires to influence consumer's purchasing decisions through the manner in which Keystone advertises its products, and which features it highlights and emphasizes—in this case, the step pads and stepping functions of the step bars.  In this way, Keystone creates an environment of sale that showcases the stepping function of the step bars.  *See Lenox Collections, a div. of Lenox, Inc. v. United States*, 20 C.I.T. 194, 199, 1996 WL 47155 (Ct. Int'l

Trade 1996) (finding that although the ads described the merchandise as both decorative and functional, the ads stressed the decorative nature of the containers).

Further, as explained above in Section III.B, Keystone's Facebook page for TrailFX products, *see* Def. SOF at ¶¶ 19-21 (Def. Ex. 6), serves as a marketing tool for engaging with current and potential customers and promoting and further advertising its products.  As noted above, the majority of the posts describe Keystone's products as steps, step bars, or side steps, which again is reflective of Keystone's practice of highlighting the step bars' stepping function in its marketing materials.  Def. SOF, ¶ 21 (*see also* Def. Ex. 6).  Therefore, the undisputed record evidence shows that the manner in which the step bars are advertised primarily reflects their stepping function.

Finally, Keystone's imported products are sold online via various websites and in physical retail locations and showrooms.  Def. SOF, ¶ 27 (*see also* Def. Ex. 8).  A&A Auto Stores sells Keystone's imported products, as well as various other auto parts, on its website (https://www.aaautostores.com/).  Def. SOF, ¶ 28 (*see also* Def. Ex. 8, at 1).  Significantly, the A&A Auto Stores website does not display Keystone's imported products in the "Vehicle Protection" sub-category of the Products>Exterior category (https://www.aaautostores.com/products/exterior/vehicle-protection).  Def. SOF, ¶ 29 (*see also* Def. Ex. 9).  Instead, the A&A Auto Stores website sells "nerf bars" and "steps" in the "Nerf Bars & Steps" sub-category of the Products>Exterior category (https://www.aaautostores.com/products/exterior/nerf-bars-steps).  Def. SOF, ¶ 30 (*see also* Def. Ex. 10).  Further, the A&A Auto Stores website displays "nerf bars," "steps," "step bars," "side steps," and "side step bars" under the "Nerf Bar" sub-category of the Products>Exterior>Nerf Bars & Steps sub-category (https://www.aaautostores.com/products/exterior/nerf-bars-steps).

Def. SOF, ¶ 31 (*see also* Def. Ex. 11).  As such, the record evidence also shows that the manner

in which the step bars are displayed emphasizes their primary function as steps or stepping

surfaces, and not the moderate protection they afford.

### E.  Use In The Same Manner Which Defines The Class

Fifth, the actual use or "use in the same manner which defines the class," shows that the

imported step bars are not commercially fungible with "side protective attachments," and are

instead commercially fungible with step bars and boards that are primarily used for stepping

purposes.  *Carborundum*, 536 F.2d at 377.  Although the evidence indicates that Keystone's step

bars provide "moderate protection against road hazards and debris,"[7] *see* Def. SOF at ¶ 25 (*see*

*also* Pl. Ex. B-1, at 55) and Def. Resp. at ¶ 18, the step bars' ultimate and primary use, consistent

with the manner in which other similar bars or boards with steps (like running boards and side

steps) are used, is for their stepping function.  This is true even though the step bars also provide

some aesthetic value, *e.g.*, "a sleek and stylish look."  Def. SOF, ¶ 24 (*see also* Pl. Ex. B-1, at

55).  As such, neither the additional protection for grit nor the additional stylish look provided by

the step bars reflect their primary purpose or use, which is clearly for their stepping function, as

evidenced by Keystone's emphasis on the products' stepping functions.

First, it is undisputed that Keystone uses the terms "step bars," "side steps," "nerf bars,"

and "side bars" interchangeably to describe the subject merchandise, and it is also undisputed

---

[7] Plaintiff characterizes the protection afforded by the side bars as "additional," "mild,"
"moderate," or even "superior."  *See* Def. Resp., ¶ 18.  But such descriptions are not dispositive,
because the undisputed facts show that, even if it were demonstrated that the step bars offer
"superior stone pecking protection," *see* Def. SOF at ¶ 25 (*see also* Pl. Ex. B-1, at 55) and Def.
Resp. at ¶ 18, the balance of the evidence would still show that "the use which exceeds any other
single use" is the step bars' stepping function.  *Dependable*, 757 F.3d at 1379; *see also* Def. Ex.
5 (Kozak Depo.), at 36:5-8: "My report shows that the addition of the Keystone product to a
vehicle that does not have it will give it superior stone pecking *performance*." (emphasis added).

that all of Keystone's products at issue in this case have rubberized plastic step features.  Def. SOF, ¶ 1 (*see also* Pl. Ex. D, at 14:4-11, 46:6-14, and 115:21-117:4); Def. Resp., ¶¶ 12, 19. Moreover, as explained above, documentary evidence provided by Keystone shows that nerf bars are "essential for those who want a safe area to step onto while exiting or entering a pick-up truck," as they provide "a stepping surface on the entry points of [a] truck," and that "[m]uch like running boards, [nerf bars] also have the same function—allowing [an individual] to get in or out of the truck" more easily.  Def. SOF, ¶¶ 2-8 (*see also* ECF No. 9-1, at 65-66, 69, 75-77).  In addition, "[a] side bar's primary function is to provide a stepping surface into the vehicle."  Def. SOF, ¶ 22 (*see also* Def. Ex. 7, at 1).  As such, the record evidence shows that the primary function and use of Keystone's step bars, also known as side steps, nerf bars, and side bars, is to facilitate stepping into and out of high road clearance vehicles.

Furthermore, side bars that lack steps involve "a totally different design" and are "more for rock crawling and aggressive or more aggressive applications" as compared to the step bars imported by Keystone.  Def. SOF, ¶¶ 9-10 (*see also* Def. Ex. 1, Fabbro Depo., at 23:12-22).  As such, this fact shows that the imported step bars are not commercially fungible with "side protective attachments" such as bars that lack steps and which are used in more aggressive applications.

Additionally, Keystone submitted Patent Nos. US7416202B2 and US7717444B2, which relate to the design and physical characteristics of "products substantially identical to the imported products," explicitly indicate that "[t]he primary object" of these inventions is "assist[ing] entry into [a] vehicle['s] passenger compartment."  Def. SOF, ¶¶ 11-13 (*see also* Def. Ex. 2, Pl.'s Resp. to Def.'s First Req. for Prod., No. 5; Def. Ex. 3, at 6; Def. Ex. 4, at 6).

Finally, as explained above in Sections III.B and D, Keystone looks at customers' social media to ascertain how they are using the subject merchandise.  Def. SOF, ¶ 18 (*see also* Def. Ex. 1, Fabbro Depo., at 95:5-12).  Moreover, Keystone's Facebook page for TrailFX products, *see* Def. SOF at ¶ 19 (Def. Ex. 6, at 1), serves as a marketing tool for engaging with current and potential customers and showing how its customers use its products.  As noted above, the majority of the posts describe Keystone's products as steps, step bars, or side steps, which again confirms Keystone's decision to highlight the step bars' use as steps in its marketing materials. Def. SOF, ¶ 21.  Together, this evidence shows that Keystone's customers are using its products primarily as steps or for their stepping functions.  In sum, this is another factor showing that the principal use of the step bars is for facilitating entry into and exit from a vehicle.

### F.  Economic Practicality Of The Specified Use

As indicated above, the record evidence shows that the protection afforded by the subject merchandise is "not the primary" feature, purpose, or function of the subject merchandise.  Def. SOF, ¶ 14 (*see also* Def. Ex. 1, Fabbro Depo., at 78:23-79:11, 69:3-22).  Moreover, the protection afforded by the step bars is generally "moderate" and "against road hazards and debris."  Def. SOF, ¶ 25 (*see also* Pl. Ex. B-1, at 55); Def. Resp., ¶ 18.[8]  Further, Keystone does not have any specific data or metrics showing what percentage of customers use the subject merchandise in a certain way or how often they use it.  Def. SOF, ¶ 26 (*see also* Def. Ex. 1, Fabbro Depo., at 95:2-17).  As such, the record lacks any probative evidence showing the economic practicality of using the step bars solely or primarily for protection.

---

[8] *See also* Def. Ex. 5 (Kozak Depo.), at 36:5-8: "My report shows that the addition of the Keystone product to a vehicle that does not have it will give it superior stone pecking *performance*." (emphasis added).

### G.  Recognition In The Trade Of The Specified Use

Last, the Court may consider whether the merchandise is recognized in the trade as having that particular use or whether it meets certain specifications recognized in the trade for that particular class of products.  *Carborundum*, 536 F.2d at 377; *Aromont*, 671 F.3d at 1316. Here though, there is no evidence of industry-specific specifications for step bars whose principal use is for stepping or for bars without steps whose principal use is for protection.  *See, e.g.*, *Aromont*, 671 F.3d at 1316 (noting that neither party provided evidence of industry-specific specifications for the imported soups and broths).

Although the evidence indicates that Keystone's step bars provide "moderate protection against road hazards and debris," *see* Def. SOF at ¶ 25 (*see also* Pl. Ex. B-1, at 55), the step bars' ultimate and primary use, consistent with the manner in which other similar bars or boards with steps (like running boards, footboards, and side steps) are used, is for their stepping function. This is true even though the step bars also provide some aesthetic value, *e.g.*, "a sleek and stylish look."  Def. SOF, ¶ 24 (*see also* Pl. Ex. B-1, at 55).  But neither the additional protection against road debris nor the additional style provided by the step bars reflect their primary purpose or use as steps, as evidenced by descriptions of running boards, nerf bars, and side bars found in the industry, all of which are described as having the same function—allowing an individual to step into and out of a vehicle's cab more easily.  Def. SOF, ¶¶ 2-8, 22 (*see also* ECF No. 9-1, at 65-66, 69, 75-77; Def. Ex. 7, at 1).

Moreover, in several of its own documents—particularly those which market its products to its customers, such as on the online product page for the TrailFX A1005B—Keystone characterized several of its own imported products as "side steps," "step bars," "steps," "step products," and "step types."  Def. SOF, ¶ 15 (*see also* Pl. Ex. B-1, at 55).  As such, the

importer's description of its own products also shows that the imported products are recognized and used in the trade as steps.  *See, e.g.*, *Aromont*, 671 F.3d at 1316 (holding that this factor slightly favored the government given the importer's own description of the product).

In sum, the balance of the *Carborundum* factors shows that the principal use of the subject products is for their stepping function.  Thus, when the record evidence is considered in its entirety, the principal use of the class of goods at issue is not as "side protective attachments," but rather as step bars or steps for assisting an individual to enter and exit a vehicle's cab.

III.   **THE GRANT OF AN EXCLUSION TO ANOTHER IMPORTER'S MERCHANDISE IS NOT A FACTOR THAT THE COURT CONSIDERS FOR PURPOSES OF DETERMINING THE APPLICABILITY OF THE EXCLUSION**

Keystone makes arguments regarding USTR's grant of Polaris's exclusion in support of its argument that the exclusion at issue applies to the subject merchandise.  *See* Pl. Mot., Sections II-III.  However, the grant of an exclusion to another importer's merchandise is not a factor that the Court considers for purposes of determining the general application of an exclusion.

Pursuant to the public guidance provided to the trade community, and the general rules of statutory interpretation, "the scope of each exclusion is governed by the scope of the ten-digit HTSUS headings and product descriptions in the Annex to this notice, ***and not by the product descriptions set out in any particular request for exclusion***."  *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601 (emphasis added); *see also* Pl. Mot., 16 (emphasis added).  As such, the product descriptions submitted by Polaris are not a factor that the Court considers in determining the applicability of the exclusion to Keystone's merchandise.  As explained above, the exclusion at issue involves an analysis of the principal use of Keystone's step bars, not of Polaris's products.

Keystone argues that it is not improper for the Court to consult Polaris's application for an exclusion, invoking the principle that the Court may consult "lexicographic and scientific authorities, dictionaries, and ***other reliable information sources***" to ascertain the appropriate common and commercial meaning of a term.  Pl. Mot., 16 (emphasis in original).  Not so.  The Court determines the common meaning of the terms "side," "protective," and "attachments" by reviewing dictionary definitions, which shows that the meaning of these terms is clear.  Keystone further offers a red herring by arguing that "the materials used in the development of this exclusion provision—including the original application—may well serve as the most reliable information source to determine USTR's intent in crafting and issuing the exclusion language covering 'side protective attachments.'"  Pl. Mot., 17.  But such an argument disregards the legal framework ("the scope of each exclusion is governed by the scope of the ten-digit HTSUS headings and product descriptions in the Annex to this notice, ***and not by the product descriptions set out in any particular request for exclusion***") and the general rules of statutory interpretation.  *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601 (emphasis added).  The parties agree on the dictionary definition of "protective," such that it is unambiguous.  Therefore, it is unnecessary to consult other sources to further define that term.

Even if we assumed, for purposes of argument, that the Court considers the example of the exclusion provided to Polaris for purposes of determining the applicability of the exclusion to Keystone, which it should not, this example does not support plaintiff.  Significantly, Polaris's merchandise, the Smittybilt Side Armor, is referred to as "side armor" and does not include any steps or step pads.  Compl. Exs. C and D.  As such, the merchandise differs significantly in both name and physical characteristics from Keystone's step bars, which feature rubberized plastic step features and which are regularly referred to as step bars and side steps.  Def. SOF, ¶ 1 (*see*

28

*also* Pl. Ex. D, at 14:4-11, 46:6-14, and 115:21-117:4); Def. Resp., ¶¶ 12, 19.  Furthermore, the

Smittybilt Side Armor is described as providing "the ultimate protection for the sides and under

section of" a Wrangler, unlike Keystone's step bars which do not provide "ultimate" protection.

Compl. Ex. D, at 31; Def. SOF, ¶ 25 (*see also* Pl. Ex. B-1, at 55).  Further, out of the six

descriptive bullet points at Ex. D, *three* of them—the second, third, and fifth—describe the type

of protection that Smittybilt Side Armor provides, including such protection being described

varyingly as "ultimate" or "maximum" protection, whereas only *one* bullet point—the third

one—notes that it "[p]rovides protection and a step at the same time."  Compl. Ex. D, at 31.  In

contrast, as explained above in Section III, Keystone's step bars are primarily designed,

advertised, and used for the stepping function.

Together, the facts about the Smittybilt Side Armor show that its principal function is

protective in design and description, and that its additional stepping function is secondary to its

protective functions.  As such, it meets the description of "side protective attachment," because it

is a side attachment for vehicles that primarily provides a protective function.  This stands in

direct contrast to Keystone's step bars, whose principal use is as steps and whose "moderate"

protective functions are secondary or tertiary.  Def. SOF, ¶ 25 (*see also* Pl. Ex. B-1, at 55).

## CONCLUSION

As we have demonstrated above, the exclusion at U.S. Note 20(iii)(213) to Subchapter III

of Chapter 99, HTSUS for steel "side protective attachments" does not apply to Keystone's

imported products, which are step bars or side step attachments.  For all the foregoing reasons,

we respectfully request that the Court deny plaintiff's motion for summary judgment, grant our

cross-motion for summary judgment, enter judgment for defendant dismissing this action, and

grant defendant such other and further relief as may be just and appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:     /s/ Justin R. Miller
        JUSTIN R. MILLER
        Attorney-In-Charge
        International Trade Field Office

*Of Counsel*:                                    /s/ Brandon A. Kennedy
Valerie Sorensen-Clark                           BRANDON A. KENNEDY
General Attorney                                 Trial Attorney
Office of the Assistant Chief Counsel            Civil Division, U.S. Dept. of Justice
International Trade Litigation                    Commercial Litigation Branch
U.S. Customs and Border Protection                26 Federal Plaza, Room 346
New York, New York 10278                         New York, New York 10278
                                                 Tel.: (212) 264-9230
                                                 *Attorneys for Defendant*

Dated: February 16, 2024

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  HON. JENNIFER CHOE-GROVES, *JUDGE*

| | |
|---|---|
| KEYSTONE AUTOMOTIVE OPERATIONS, INC., : | |
| : | |
| Plaintiff,    : | Court No. 21-00215 |
| : | |
| v.    : | |
| : | |
| UNITED STATES,    : | |
| : | |
| Defendant.    : | |
| : | |

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Brandon A. Kennedy, a Trial Attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is the attorney responsible for Defendant's Cross-Motion for Summary Judgment and Memorandum of Law in Support Thereof and in Opposition to Plaintiff's Motion for Summary Judgment, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 12,056 words.

<u>/s/ Brandon A. Kennedy</u>
BRANDON A. KENNEDY