**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| **KEYSTONE AUTOMOTIVE OPERATIONS, INC.,** | |
| Plaintiff, | Court No. 21-00215 |
| **v.** | **NON-CONFIDENTIAL** |
| **UNITED STATES**, | |
| Defendant. | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION**
**FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES ..................................................................................... iii

I.  Introduction ................................................................................................ 2

II.  The Subject Merchandise is Described by the Terms of the Exclusion ("Side Protective Attachments"). ................................................................................................ 5

III.  Polaris's Exclusion Application and the Underlying Smittybilt Side Armor Clearly Show that the Subject Merchandise Comprises "Side protective Attachments." ........................ 7

IV.  The Exclusion For "Side Protective Attachments" Is Akin To An *Eo Nomine* Provision, Not One Based On Principal Use ................................................................................ 11

V.  Defendant Has Not Shown What the Principal Use of the Subject Merchandise Is and Has Not Satisfied the *Carborundum* Factors ............................................................. 20

A.  The General Physical Characteristics Of The Merchandise ............................... 24

B.  The Expectations Of The Ultimate Purchasers .................................................. 26

C.  The Channels Of Trade In Which The Merchandise Moves ............................... 27

D.  The Environment Of Sale ................................................................................. 27

F.  Economic Practicality Of The Specified Use ................................................... 29

G.  Recognition In The Trade Of The Specified Use .............................................. 29

VI.  Conclusion ............................................................................................... 31

CERTIFICATE OF COMPLIANCE ....................................................................... 32

CERTIFICATE OF SERVICE .................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*AGFA Corp. v. United States,*
*491 F. Supp. 2d 1317 (Ct. Int'l Trade 2007)* ....................................................9

*Baxter Healthcare Corp. of P.R. v. United States,*
182 F.3d 1333 (Fed. Cir. 1999)...........................................................................9

*BenQ Am. Corp. v. United States,*
646 F.3d 1371 (Fed. Cir. 2011)..........................................................................21

*Berns & Koppstein v. United States,*
13 Ct. Int'l Trade 191, 196 (U.S. 1989)..............................................................*10*

*CamelBak Prods., LLC v. United States,*
649 F.3d 1361 (Fed. Cir. 2011)..........................................................................12

*Carl Zeiss, Inc. v. United States,*
195 F.3d 1375 (Fed. Cir. 1999).....................................................................13,18

*Ford Motor Company v. United States,*
926 F.3d 741 (Fed. Cir. 2019)...............................................................14, 15, 16

*GRK Can., Ltd. v. United States,*
773 F.3d 1282 (Fed. Cir. 2014) ..........................................................................20

*Jewelpak Corp. v. United States,*
97 F. Supp. 2d 1192 (Ct. Int'l Trade 2000) ........................................................10

*Kahrs Int'l v. United States*
713 F.3d 640 (Fed. Cir. 2013) ............................................................................18

*Link Snacks, Inc. v. United States,*
742 F.3d 962 (Fed. Cir. 2014).............................................................................20

*Neco Elec. Prods. v. United States,*
14 Ct. Int'l Trade 181, 184 (U.S. 1990)...............................................................9

*Nidec Corp. v. United States,*
68 F.3d 1333 (Fed. Cir. 1995).............................................................................19

*Orlando Food Corp. v. United States,*
140 F.3d 1437 (Fed. Cir. 1998).....................................................................14, 15

*R.T. Foods, Inc. v. United States*,
757 F.3d 1349 (Fed. Cir. 2014)...........................................................................12, 20

*SC Johnson & Son Inc. v. United States*,
999 F.3d 1382 (Fed. Cir. 2021).....................................................................................18

*Specialty Commodities v. United States*,
190 F. Supp. 3d 1277 (Ct. Int'l Trade 2016) .....................................................................8

*Stewart-Warner Corp. v. United States*,
748 F.2d 663 (Fed. Cir. 1984)................................................................................ *passim*

*United States v. Carborundum Co.*,
536 F.2d 373 (C.C.P.A. 1976) .....................................................................................21

*Value Vinyls, Inc. v. United States*,
31 Ct. Int'l Trade 173 (U.S. 2007)..................................................................................10

## Statutes

19 U.S.C. § 2411...........................................................................................................2

Harmonized Tariff Schedule of the United States

    Additional U.S. Rule of Interpretation 1 ...................................................................2

    Additional U.S. Rule of Interpretation 1(a) ............................................................2

    Heading 2002.........................................................................................................2

    Heading 2103.........................................................................................................2

    Heading 3924.........................................................................................................2

    Heading 8703.........................................................................................................2

    Heading 8704.........................................................................................................2

    Subheading 8708.29.5060.......................................................................................2

    Subheading 9903.88.56...........................................................................................2

    U.S. General Rule of Interpretation 3 ......................................................................2

    U.S. Note 20(iii)(40), Subchapter III, Ch. 99 .........................................................14

U.S. Note 20(iii)(46), Subchapter III, Ch. 99 ........................................................14

U.S. Note 20(iii)(61), Subchapter III, Ch. 99 ........................................................14

U.S. Note 20(iii)(63), Subchapter III, Ch. 99 ........................................................14

U.S. Note 20(iii)(64), Subchapter III, Ch. 99 ........................................................14

U.S. Note 20(iii)(74), Subchapter III, Ch. 99 ........................................................14

U.S. Note 20(iii)(75), Subchapter III, Ch. 99 ........................................................14

U.S. Note 20(iii)(97), Subchapter III, Ch. 99 ........................................................14

U.S. Note 20(iii)(104), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(124), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(125), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(129), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(130), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(131), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(132), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(134), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(138), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(140), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(143), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(144), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(148), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(178), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(183), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(185), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(191), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(194), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(195), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(196), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(197), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(199), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(202), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(205), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(208), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(209), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(213), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(214), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(219), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(222), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(237), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(254), Subchapter III, Ch. 99 ......................................................14

U.S. Note 20(iii)(265), Subchapter III, Ch. 99 ......................................................14

**Other Authorities**

USCIT Rule 56 .........................................................................................................1

USCIT Rule 56(a) ...................................................................................................22

*Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 23,122 (April 24, 2020) ..................................................................................................................2

*Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 48,600 (Aug. 11, 2020) ("*Exclusion Extension Notice*") ............................................................. *passim*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| **KEYSTONE AUTOMOTIVE OPERATIONS, INC.,**<br><br>                              Plaintiff,<br><br>        **v.**<br><br>**UNITED STATES**,<br><br>                              Defendant. | Court No. 21-00215<br><br>**NON-CONFIDENTIAL** |

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Keystone Automotive Operations, Inc., ("KAO" or "Plaintiff") submits this response/reply memorandum in opposition to Defendant's, United States' ("Defendant" or "Government") cross-motion for summary judgment and in support of Plaintiff's motion for summary judgment. The Government's brief entirely hinges on a critical fallacy: that the Section 301 exclusion somehow must be construed as a "principal use" provision. It then creates a false dichotomy and builds arguments off this fallacy that KAO's products do not qualify for the exclusion because they are "principally used" as a class of goods that exists nowhere in the Harmonized Tariff Schedule of the United States ("HTSUS") or elsewhere outside the confines of its briefings. Plaintiff has demonstrated that no genuine dispute exists as to any material fact that requires trial of this test case within the meaning of U.S. Court of International Trade ("USCIT") Rule 56. This dispute is therefore a matter of legal interpretation, which should be resolved through summary judgment.

## I.      Introduction

In its combined cross-motion and opposition to Plaintiff's motion for summary judgment ("Def. Brief"), Defendant claims that the subject KAO nerf bars, side bars, and bars (the "subject merchandise")[1] are not covered by the terms of an exclusion to Section 301 of the Trade Act of 1974 (Pub. L. 93-618, 19 U.S.C. § 2411) ("Section 301") under secondary heading 9903.88.56 of the HTSUS.  The exclusion in this secondary heading provides for "[t]ire carrier attachments, roof racks, fender liners, *side protective attachments, the foregoing of steel (described in statistical reporting number 8708.29.5060)*." *See* U.S. Note 20(iii)(213), Subchapter III, Ch. 99, HTSUS; *see also Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 85 Fed. Reg. 23,122, 23,130 (Apr. 24, 2020) (establishing the exclusion at issue); *Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer,  Intellectual Property and Innovation*, 85 Fed. Reg. 48,600, 48,616 (Aug. 11, 2020) (extending the exclusion at issue from August 7, 2020 through December 31, 2020). Def. Brief at 29. Notwithstanding this position, Defendant acknowledges—and even concedes—at multiple points in its brief that Keystone's side bars, nerf bars, and bars meet the description of all physical characteristics set forth in the exclusion: they are made of steel, they are attachments installed onto the side of a vehicle, and they provide **protection** to the sides of the vehicle against road hazards and debris.  *See, e.g.*, Def. Brief at 23, 25, 26, 29.

Defendant also claims that Polaris's Smittybilt Side Armor (*see* Figure 2 below), which resulted in the language of the exclusion, "differs significantly in both name and physical characteristics" from KAO's side bars, nerf bars, and bars (*see e.g.*, Figure 1 below). Def. Brief at

---

[1] An example of the subject nerf bar TrailFX A1005B is depicted in Figure 1 below. The brackets used to attach this item to the vehicle are not depicted – see Plaintiff's ("Pl.") Exhibit (Pl. Ex.) B-1, p. 57.

28. All Defendant appears to have to offer to support this bold assertion is in superlative advertising language describing the Smittybilt Side Armor as offering "ultimate" or "maximum" protection, whereas KAO's merchandise can supposedly do no better than offer "moderate" protection. Def. Brief at 29. However, Defendant does not, and cannot, show how these purported differences affect the applicability of the exclusion to KAO's side bars, nerf bars, and bars. Additionally, Defendant misleads the Court when it incorrectly states that "Smittybilt Side Armor … does not include any steps or step pads" (*see* Def. Brief at 28) as more fully explained below. In sum, both KAO's and Polaris's products provide protection and step at the same time.







*Figure 1 - KAO's Side Bar. See Pl. Ex. B-1, p. 55.*

*Figure 2 – Smittybilt Side Armor. See Complaint Exhibit D.*

Defendant summarily writes that "[t]he relevant portion of the exclusion for purposes of the subject merchandise at issue, 'side protective attachments,' is not an *eo nomine* provision because it does not describe a commodity by a specific name that is common in commerce." Def. Brief at 13-14.  No explanation is provided as to how or why describing a commodity "by a specific name that is common in commerce" became the standard for determining when a provision is *eo nomine*, nor is one provided for why "side protective attachments" fail to meet this standard.

Defendant also hypothesizes, also with minimal explanation as to why this is the case, that "the phrase 'side protective attachments' must be understood as a principal use provision." Def.

Brief at 14. Defendant further assumes that "[t]he inclusion of the term 'protective' in the exclusion for 'side protective attachments' clearly contemplates that the products falling within the exclusion's reach will be used principally to protect or for protection." Def. Brief at 15.

Defendant does not present any material facts and does not establish any sound legal arguments that support its claims. Most of Defendant's brief is spent performing an irrelevant and unnecessary analysis of the *Carborundum* factors to argue that KAO's merchandise belong to a class or kind of goods that Defendant artificially invented (*i.e.*, step bars) for purposes of denying KAO the application of a legitimate Section 301 exclusion provision. Def. Brief at 15-27.[2] In doing so, Defendant misguides the Court as to how the determination of applicability of a Section 301 exclusion provision should be decided. Specifically, by the USTR's own explicit language, the "side protective attachments" exclusion is applicable to the subject merchandise *if the subject merchandise meets the description in the Annex* as more fully explained below. *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601.

The question before the court is whether KAO's side bars, nerf bars, and bars *meet the description* of "side protective attachments" provided in the Note 20 exclusion provision. The exclusion that is the subject of this case is not a "principal use" provision: it lacks any explicit or implicit language suggesting that principal use is a relevant consideration, and there is no other justifiable reason for the Court to force in a principal use analysis where none is required. Reading a principal use requirement into the exclusion contradicts both the language of the exclusion and the intent of its drafters, and impermissibly limits the scope of the exclusion.

As explained more fully below, Plaintiff has clearly shown that KAO's nerf bars, side bars, and bars meet the description of "side protective attachments," because they *protect* the *side* of the

---

[2] It has been established that the subject merchandise is classified in KAO's look-up system as a "nerf bar" as the product type. *See* Pl.'s Response to Def.'s Statement of Facts at No. 1.

vehicle to which they are *attached*. Defendant concedes this argument at multiple occasions in its brief. *See* Def. Brief at 5, 26. Regardless of the number of superlatives written about the degree of protection offered, other available functions or uses that the merchandise may perform, or any other red herrings that serve no purpose in this analysis, KAO's merchandise meets the description of the exclusion for "[t]ire carrier attachments, roof racks, fender liners, ***side protective attachments, the foregoing of steel (described in statistical reporting number 8708.29.5060)***." *See* U.S. Note 20(iii)(213), Subchapter III, Ch. 99, HTSUS.

## II.    The Subject Merchandise is Described by the Terms of the Exclusion ("Side Protective Attachments").

The USTR provides specific guidance as to how Section 301 exclusions should be analyzed and interpreted. *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601. Plaintiff explained as follows in the initial memorandum in support of Plaintiff's motion for summary judgment ("Pl. Brief"):

> The Federal Register notice published by the USTR implementing Section 301 exclusion at issue in this case provides a clearly identified standard for this Court to interpret and apply the exclusion. Specifically, the USTR explains that "the exclusions are available for ***any product that meets the description in the Annex***, regardless of whether the importer filed an exclusion request." Exclusion Extension Notice, 85 Fed. Reg. at 48,601 (emphasis added). Thus, the only criterion established by the USTR to qualify for the specific U.S. Note 20 exclusion (besides the entry timeframe) is that the product in question meets the description of merchandise set forth in the particular exclusion. Imposing any additional characteristic or criterion will result in a limitation that is not provided for and not intended by the drafters of the exclusion language.

Pl. Brief at 12-13. Nothing in Defendant's brief refuted this underlying point. *See* Def. Brief at 12-13.

To reiterate, for KAO's subject merchandise to be excluded from the additional 25% Section 301 duty per the application of U.S. Note 20(iii)(213) to Chapter 99, HTSUS, they must meet the description of "side protective attachments, the foregoing of steel (described in statistical reporting number 8708.29.5060)."  Breaking this language down, to qualify for this exclusion, the

merchandise at issue must: (1) be described in statistical reporting number 8708.29.5060; (2) be made of steel; (3) attach to the motor vehicle; and (4) protect the side of the vehicle to which it is attached. *See* Pl. Brief at 12-13.

Defendant's brief does not dispute or challenge that—for purposes of applying the exclusion—KAO's nerf bars, side bars, and bars are made predominantly of steel. *See* Pl.'s Statement of Undisputed Facts ("SOF") at No. 12 and 14; Def. Response to Pl. SOF at No. 12 and 14; Pl. Reply to Def. Response to Pl. SOF at 12 and 14. Defendant also agrees that the subject merchandise is classified under primary subheading 8708.29.5060, HTSUS. *See* Def. Brief at 8. Finally, Defendant agrees that the subject merchandise attaches to motor vehicles. *See* Pl.'s SOF at No. 14, 16, 18.d, 19; Def. Response to Pl. SOF at No. 14, 16, 18.d, 19; Pl. Reply to Def. Response to Pl. SOF at No. 14, 16, 18.d, 19.

Thus, the only remaining issue for the Court to decide is whether the subject merchandise protects the side of the vehicle to which it is attached. Importantly, the term "protective," as it is used in the exclusion description, is *not* conditioned upon some objective or subjective degree of protection, the use of a superlative such as "maximum" or "ultimate" to describe the protective capabilities, or the presence—or lack thereof—of any other available functions or uses the merchandise could perform.

The protective capabilities of KAO's side bars, nerf bars, and bars are not accidental, but fully intended by their design and construction. Plaintiff has established that the subject merchandise provides superior stone pecking protection to the side of the vehicle, protects the side of the vehicle from damage caused by various road hazards and road debris, protects the vehicle from side impacts, and enhances mild anti-collision protective capabilities with shopping carts and other potential hazards that would cause damage to the vehicle's exterior. *See* Pl.'s SOF at No.

6

18.a, 18.b, 18.c, 18.d, 18.e; Def. Response to Pl. SOF at No. 18.a, 18.b, 18.c, 18.d, 18.e; Pl. Reply

to Def. Response to Pl. SOF at No. 18.a, 18.b, 18.c, 18.d, 18.e.

Defendant did not challenge, contradict, or otherwise attempt to refute these features in its

response brief. In fact, it *conceded* at multiple occasions that Plaintiff's merchandise provide

"protection against road hazards and debris." *See, e.g.*, Def. Brief at 26. Thus, it is undisputed that

the subject merchandise protects the side of the motor vehicle to which it is attached. Given this,

Plaintiff's side bars, nerf bars, and bars are described by the terms of the exclusion for "side

protective attachments, the foregoing of steel" provided for in U.S. Note 20(iii)(213) to Chapter

99, HTSUS, under subheading 9903.88.56, HTSUS. This should end the analysis, because there

are no further requirements outlined in the language of the exclusion.

### III.    Polaris's Exclusion Application and the Underlying Smittybilt Side Armor Clearly Show that the Subject Merchandise Comprises "Side protective Attachments."

Plaintiff demonstrated in its initial brief how KAO's subject merchandise represents the

same class or kind of merchandise as the "Smittybilt Side Armor" attachments, which were the

subject of Polaris Industries Inc.'s ("Polaris's") request for exclusion that ultimately led to the

exclusion for "side protective attachments." Pl's Brief at 16-18. Notwithstanding this, Defendant

brazenly claims that "the grant of an exclusion to another importer's merchandise is not a factor

that the Court considers for purposes of determining the general application of an exclusion." Def.

Brief at 27. This assertion is not supported by any legal precedent, general rules of statutory

interpretation, or even in the U.S. Trade Representative's ("USTR's") own specific instructions.

This case is a matter of first impression; the Court has not had an opportunity to ascertain or

determine what factors it would consider for "determining the general application of an exclusion."

The construction of, and language used in, Section 301 exclusion provisions are distinct

from regular headings and subheadings under the HTSUS. The HTSUS is an enactment of

Congress, and is maintained and published by the U.S. International Trade Commission ("USITC"). Additions and changes to the HTSUS at the statistical level are administered by the USITC Committee for Statistical Annotation of the Tariff Schedules (the "484(f) Committee"). In contrast, Section 301 exclusions are the creation of interagency teams under direction of the USTR, assembled to determine the appropriateness and applicability of exclusion requests that had been submitted by industry participants. The Section 301 exclusions are reviewed, drafted, and published by the USTR, in conjunction and after consultation with USITC and U.S. Customs and Border Protection ("CBP") officials.  Notably, the role of USITC and CBP officials in this process is strictly to review the exclusion language for administrability under the 10-digit primary HTSUS subheading specified in the exclusion. Plaintiff's understanding is that neither USITC nor CBP reviews the specific language of the exclusion itself, nor shapes the manner in which it applies to the product intended for coverage. In sum, while the Section 301 exclusion provisions are housed within the HTSUS, they have a much different genesis in their history and development.

The Government references throughout its brief that "the scope of each exclusion is governed by the scope of the ten-digit HTSUS headings and product descriptions in the Annex to this notice, and not by the product descriptions set out in any particular request for exclusion." *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601. However, Plaintiff is not arguing that its products should be excluded from Section 301 duties because they meet the description of products described in Polaris's exclusion request. As discussed in Section II above, Plaintiff has already demonstrated that its side bars, nerf bars, and bars meet the literal terms of the exclusion description set forth in U.S. Note 20(iii)(213) to Chapter 99, HTSUS.

However, the Court's independent duty is to interpret the tariff terms "to arrive at the correct result, ***by whatever procedure is best suited to the case at hand***." *Specialty Commodities*

*v. United States*, 190 F. Supp. 3d 1277, 1301 (Ct. Int'l Trade 2016) (emphasis added). The Court thus must have adequate tools at its disposal to ascertain the proper interpretation of these terms. Those tools, as Plaintiff noted in its brief, include "lexicographic and scientific authorities, dictionaries, and other reliable information sources." Pl. Brief at 16, *citing Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999). In fact, it is common for the Court, when it is presented with an ambiguous or unclear tariff term, to examine any legislative history behind the term. *See, e.g.*, *AGFA Corp. v. United States*, 491 F. Supp. 2d 1317, 1321 (Ct. Int'l Trade 2007) ("The first step in properly construing a tariff classification term is to determine whether Congress clearly defined that term in either the HTSUS *or its legislative history*."); *see also Neco Elec. Prods. v. United States,* 14 Ct. Int'l Trade 181, 184 (U.S. 1990) ("When the court is confronted with conflicting interpretations of a tariff provision, and there is doubt or ambiguity, *it is proper to resort to legislative history and other appropriate extrinsic guides*."). Plaintiff's point is that the Court should consider Polaris's request for exclusion, which specifically identifies the product to be covered (Smittybilt Side Armor – *see* Figure 2 above) by the exclusion language, as a "reliable information source," or even a critical part of the exclusion's administrative history, to better understand the drafter's intent when preparing the exclusion language.

Defendant attempts to refute this argument by stating that "[t]he Court determines the common meaning of the terms 'side,' 'protective,' and 'attachments' by reviewing dictionary definitions, which shows that the meaning of these terms is clear."[3] Def. Brief at 28. That is obviously a selective, and overly restrictive, interpretation of the standard set forth in *Baxter*

---

[3]    Plaintiff and Defendant seemingly agree that the dictionary definition of the term "protect" to mean "1a: to cover or shield from exposure, injury, damage, or destruction." *See* Def. Brief at 15. However, Plaintiff does not agree with Defendant's subsequent characterization that the term "protective" in the exclusion for "'side protective attachments' clearly contemplates that the products falling within the exclusion's reach will be used principally to protect or for protection." *Id.* Specifically, nothing either in the provided definition nor in the exclusion's language incorporates the term "principally" or "clearly contemplates" requiring a principal use inquiry.

*Healthcare* and innumerable subsequent decisions. The Court is not forced to adhere to a hierarchy of information sources, and it should consider all available sources that are at its disposal to ascertain the intent behind the drafters of the exclusion provisions. This is no different from the Court consulting the 1960 Tariff Classification Study (*see Berns & Koppstein v. United States*, 13 Ct. Int'l Trade 191, 196 (U.S. 1989)), Harmonized Commodity Description and Coding System, Explanatory Notes (*see Jewelpak Corp. v. United States*, 24 Ct. Int'l Trade 249, 97 F. Supp. 2d 1192 (2000)), Congressional Reports (*see Value Vinyls, Inc. v. United States*, 31 Ct. Int'l Trade 173, 177 (U.S. 2007)), and other non-statutory references that have merit in evidencing the provision drafters' intent. Here, to ignore the proposed language and description of subject merchandise from an exclusion request would be to ignore an important aspect of the administrative history leading to the development of the Section 301 exclusion.

Plaintiff also reiterates that the Court here simply has to decide whether Plaintiff's merchandise meets the description set forth in the Section 301 exclusion for "side protective attachments." In doing so, the information contained in the exclusion request regarding the Smittybilt Side Armor—the product that caused the exclusion language to exist in the first place— is certainly valuable in evidencing the drafters' intent. The condition in the Federal Register Notice does not prohibit the Court from examining the exclusion application and supporting materials for the purpose of better understanding the intent of the drafters. In fact, it is only logical to ascertain what specific class or kind of products the USTR intended to cover by drafting the "side protective attachment" exclusion through an examination of Polaris's original exclusion request.

When Figure 1 and Figure 2 above are compared, it becomes clear that the items are substantially identical in terms of use and functionality (they both provide protection and step at the same time) and contain only slight differences in design that do not weigh on the items'

protective capabilities. In fact, Plaintiff's expert witness, Mr. Stephen Kozak, confirmed that, because Smittybilt Side Armor is constructed with holes running along the bar, it is less effective in terms of stone pecking protection than KAO's side bars. *See* Pl. SOF at No. 30, 31, 32, and 33; Def. Response to Pl. SOF at No. 30, 31, 32, and 33; Pl. Reply to Def. Response to Pl. SOF at No. 30, 31, 32, and 33. Plaintiff highlights that, contrary to Defendant's assertion that Smittybilt Side Armor does not include any steps or step pads, *see* Def. Brief at 28, Smittybilt Side Armor ***does*** include stepping surfaces—as clearly shown in Figure 2 above and in Compl. Ex. C. and confirmed by KAO's expert witness. *See* Pl. SOF at No. 29. Similar to the Smittybilt Side Armor, KAO's nerf bars, side bars, and bars also include step surfaces.

Based on the exclusion request and the description of the subject merchandise in this case, both Polaris's Smittybilt Side Armor and KAO's nerf bars, side bars, and bars share the following characteristics: both products attach to the side of a vehicle, both products provide protection to the side of the vehicle to which they are attached, and—although irrelevant to the exclusion language—both products serve as a step up into the vehicle. *See* Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Pl. Reply to Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33. Thus, despite minor design differences, both products are functionally identical. More importantly, both KAO's nerf bars, side bars, and bars, along with Polaris's Smittybilt Side Armor—the product which resulted in the exclusion language—meet the description of the term "side protective attachments" set forth in the Section 301 exclusion.

### IV.    The Exclusion For "Side Protective Attachments" Is Akin To An *Eo Nomine* Provision, Not One Based On Principal Use.

For a Section 301 exclusion to apply to a particular product, such product must meet the description in the Annex. *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601. The exclusion that is at issue in this case provides specifically for "[t]ire carrier attachments, roof racks, fender liners,

*side protective attachments, the foregoing of steel (described in statistical reporting number 8708.29.5060)*." *See* U.S. Note 20(iii)(213), Subchapter III, Ch. 99, HTSUS.

It follows that conditioning an exclusion on some additional characteristic or criterion that is not part of the exclusion's description—such as principal use—will result in a limitation that is not provided for and not intended by the drafters of the exclusion language. However, Defendant here does exactly that when arguing that the "side protective attachments" exclusion should be analyzed as a "use provision." Def. Brief at 13-15. In doing so, Defendant imposes an additional barrier to the exclusion that was not intended by the drafters of the exclusion provision. This should not be allowed.

Notably, neither the *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601, nor any other relevant Federal Register Notices, dictate when or how the various exclusions must be considered as *eo nomine* provisions or exclusions based on principal or actual use. As such, Plaintiff maintains that each exclusion stands for itself, and there are no inherent additional characteristics, qualifications, or limitations that should be read into the language of the exclusion. With respect to the exclusion for "side protective attachments, the foregoing of steel," to the extent that an analysis of this exclusion language parallels a "traditional" tariff classification analysis in ascertaining whether the exclusion at issue is an *eo nomine* or use provision, it is clearly in the former category – *eo nomine*.

It is a well settled precedent that an "*eo nomine* provision" "describes an article by a specific name" and "includes all forms of the named article." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014) (*citing CamelBak Prods.*, 649 F.3d at 1364 (citing *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)). In particular, an *eo nomine* provision can include an "improved" form of an article. *Id*. This explanation tracks most closely

12

to the language in the USTR's Federal Register notices, specifically, the USTR's instruction that "the exclusions are available for ***any product that meets the description in the Annex***." The language of the exclusion is thus akin to *eo nomine* provision, because it describes an article by a specific name – "side protective attachments."

The USTR's Federal Register Notice instructions do not indicate that a principal use analysis is an inherent part of analyzing an exclusion's applicability. Likewise, the description of the subject exclusion does not indicate any type of use or degree of use in any way. Rather, Defendant has to engage in a series of grammatical distortions and mutations to the exclusion language, by changing the wording and structure of the language to artificially read "principal use" in a way that was not provided for and not otherwise intended by the drafters. Def. Brief 14-15. These linguistic gymnastics cannot and do not change the language of the exclusion, and they certainly do not permit reading in a limitation to the exclusion's scope.

First, and contrary to Defendant's contention, this exclusion is not a "use provision" because it does not describe an article by its principal or actual use. Nothing in the language of the subject exclusion describes any use criteria and/or limitation. The terms that are generally found in principal use provisions: "use" or "used," "for use in," "designed for use," "of a kind used" or "of a kind for use," "solely or principally used," and so on, are notably *absent* from the language of this exclusion.

Plaintiff further notes that use terms, including those exemplified above, are liberally applied in other Section 301 exclusions set forth throughout U.S. Note 20 to Chapter 99, HTSUS. *See e.g.*, U.S. Note 20(iii)(40), (46), (61), (63), (64), (74), (75), (97), (104), (124), (125), (129), (130), (131), (132), (134), (138), (140), (143), (144), (148), (178), (183), (185), (191), (194), (195), (196), (197), (199), (202), (205), (208), (209), (214), (219), (222), (237), (254), and (265). All

13

these specific exclusions demonstrate that the USTR had the capability of treating an exclusion as a use provision by intentionally inserting use provisions into the exclusion language. The USTR clearly had the opportunity and the means to characterize the instant exclusion as a principal use provision if that were its intent, *e.g.*, by drafting the exclusion to read "*side attachments solely or principally used for protection*" or in a similar manner. It did not do so here, and thus the Court should not read one into the description of the exclusion.

Defendant cites three main cases in support of its argument of applying a "principal use" analysis for the exclusion for "side protective attachments": *Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998); *Ford Motor Company v. United States*, 926 F.3d 741 (Fed. Cir. 2019); and *Stewart-Warner Corp. v. United States*, 748 F.2d 663 (Fed. Cir. 1984).

From the outset, Plaintiff notes that all of these cases are distinguishable, because none of these cases dealt with the interpretation or application of a Section 301 exclusion. As discussed, Section 301 exclusions are separate from regular HTSUS headings and subheadings because they were created and drafted under a completely different framework; were published by the USTR in response to exclusion requests submitted by U.S. industry participants, importers, and other interested parties; and were published with specific guidance from the USTR as to how the exclusions should be analyzed. Specifically, the exclusion applies if the product "***meets the description of the exclusion***" published in the Annex. *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601 (emphasis added). Thus, each exclusion is governed by its own specific language, and there is no need to compare competing provisions when determining the applicability of a particular exclusion.

With respect to each case specifically: *Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998), involved the tariff classification of a canned prepared tomato product. The

Court's analysis was based on U.S. General Rule of Interpretation ("GRI") 3; it was comparing an *eo nomine* tariff provision (Heading 2002: "Tomatoes prepared or preserved") against a provision that was arguably based on principal use (Heading 2103: "Sauces and preparations therefor"). *Id.* at 1441. In managing this comparison, the Court was "guided by the general rule of customs jurisprudence that, 'in the absence of legislative intent to the contrary, a product described by both a use provision and an *eo nomine* provision is generally more specifically provided for under the use provision.'" *Id.* Also, the classification of the product in that case "turn[ed] on which of [the] two provisions [was] the more specific. Under this so-called rule of relative specificity, [the Court] look[ed] to the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty." *Id. at* 1441.

The reasoning and analysis that the Court applied in *Orlando Foods* is not pertinent in the case at hand, however.  This dispute does not involve a comparison between two competing tariff provisions. There is no existing provision or reference in the HTSUS for "step bars"; it is a false dichotomy, created by Defendant to artificially and impermissibly narrow the scope of the Section 301 exclusion for "side protective attachments." The Court here is not tasked with comparing a provision for "side protective attachments" against a competing provision for "step bars." This is **not** a GRI 3 case, and the Court thus does not need to decide which of these provisions is more specific, more difficult to satisfy, occurs last in numerical order, or anything of that nature. The Court simply needs to determine whether KAO's subject merchandise is described by the terms of the exclusion. Thus, *Orlando Foods* is clearly distinguishable.

*Ford Motor Company v. United States*, 926 F.3d 741, 759 (Fed. Cir. 2019) involved a dispute over the tariff classification of certain vehicles, again involving two competing headings: HTSUS Heading 8703, covering "motor vehicles principally designed for the transport of

persons"; and HTSUS heading 8704, covering "[m]otor vehicles for the transport of goods." *Id*. at 758-759. In that case, the Court determined that Heading 8704 was a "principal use" provision, relying heavily on the language "*for the transport of goods*," which the Court held identified the chief use of the covered merchandise as "of a kind used to transport goods." *Id.* at 759. Again, however, the instant case does not involve a comparison between competing headings. The Court is not being asked to compare a provision for "side protective attachments" against an imaginary provision for "step bars." Furthermore, unlike *Ford*, nothing in the subject exclusion language at issue here—"side protective attachments"—mandates a chief or principal use analysis of the article intended to be covered by the exclusion language. Specifically, the term "side protective attachments" does not contain the preposition "for" or any other terms or indications as being a "use provision," even as myriad other exclusions were written with use conditions attached, as noted *infra.* Thus, *Ford* is also clearly distinguishable.

Finally, *Stewart-Warner Corp. v. United States*, 748 F.2d 663 (Fed. Cir. 1984), a case that predates the HTSUS and the General Rules of Interpretation, involved a dispute over the interpretation of the tariff term "bicycle attachments." Given the interpretive maxims in place at the time, this was a case that interpreted the "Chief Use concept"—the predecessor to Additional U.S. Rule of Interpretation 1—in which "a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States . . . of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, *i.e.*, the use which exceeds all other uses (if any) combined[.]" *Id.* at 667 (emphasis added).

The tariff provision at issue in the *Stewart-Warner* case—bicycle speedometers—also involved a "generic" noun preceded by a more "specific" adjective. That is where the similarities end. The term "bicycle" in *Stewart-Warner* carved a definitive divide of the broader class of goods

known as "speedometers" into two categories – those that are used on bicycles and those that are not. A speedometer can belong to only one of those two categories. As the Court noted in that case, "logic compels one to consider some aspect of use" in examining that provision. *Id.*

However, that logic does not carry forward to the term at issue here – "side protective attachments." In its reference of the *Stewart-Warner* case, the Government fails to acknowledge that Court's instruction in the very same section: "If the modifying word or words were purely descriptive – *i.e.*, a 'green' speedometer or a 'three-inch-in-diameter' speedometer – then the question of use would not arise." *Stewart-Warner Corp.*, 748 F.2d 663, 667 (Fed. Cir. 1984). The term "protective" has to be considered such a descriptive term. Consistent with the dictionary definition of the term "protect" ("to cover or shield from exposure, injury, damage, or destruction") with the suffix "-ive" typically indicating the item has a tendency, inclination, character, or quality of the term, designating something as "protective" is a descriptive term indicating that the product has the character or quality of covering or shielding something from exposure, injury, damage, or destruction. This description does not imply use, unlike how the term "bicycle speedometer" compels determining whether a speedometer is used on a bicycle or on something that is not a bicycle.

The Government concedes in its brief that KAO's bars provide "moderate protection against road hazards and debris," only seemingly to argue that "moderate" protection somehow fails to meet the exclusion, while a bar that provides "maximum" or "ultimate" protection does. Def. Brief at 28-29. If the Government is trying to draw distinctions between protection that is characterized as "moderate" versus production that is characterized as "ultimate" or "maximum," it has strayed so far from the *Stewart-Warner* decision so as to render its reliance on that case meaningless.

Finally, Plaintiff notes that the case Defendant directly referenced that cited to the *Stewart-Warner* decision is *SC Johnson & Son Inc. v. United States*, 999 F.3d 1382 (Fed. Cir. 2021). Defendant alleges that this case "further confirms that 'generic terms preceded by an adjective suggesting a manner of use can constitute principal use provisions.'" Def. Brief at 14. The tariff provision in dispute in that case—Heading 3924, covering "household articles . . . of plastics"—conceivably involves the generic term "articles" preceded by the adjective "household." However, the Court in the *SC Johnson & Son* case held that this HTSUS heading **was an *eo nomine* provision, and *not* one based on principal use**. *Id.* at 1390. Specifically, the Court found that none of the terms in HTSUS Heading 3924, "household" or otherwise, would act as an adjective "that suggests a type of use rather than a location where . . . objects can be found." Plaintiff thus asserts that the *SC Johnson & Son* case ***does not in fact*** support Defendant's argument or insinuation that a generic term preceded by an adjective would automatically render the provision into one that is based on principal use.

As shown above, the "principal use" limitation is not applicable to the "side protective attachments" exclusion. It is a well settled precedent that "a use limitation" should not be read "into an *eo nomine* provision unless the name itself inherently suggests a type of use." *Kahrs Int'l v. United States*, 713 F.3d 640, 646 (Fed. Cir. 2013), citing *Carl Zeiss*, 195 F.3d at 1379 (Fed. Cir. 1999). Thus, Defendant's reliance on the assumed primary or principal use of the subject merchandise is contrary to the well-established legal precedent. Additionally, reading a use limitation into the language of the exclusion creates an additional limitation not intended by the drafters as evidence by the language of the exclusion.

Defendant claims that "there is no evidence in the record that shows that 'side protective attachments' is a specific name for a commodity that is common in commerce." Def. Brief at 14.

On one hand, this is a disingenuous assertion. The Section 301 exclusion provisions are all manifestations of the USTR and various USTR interagency teams, and there is no information on the record to indicate exactly how or why the USTR drafted the provision for "side protective attachments" in such a way. On the other hand, KAO has clearly shown that the term "side protective attachment," introduced by USTR in the Federal Reister Notice, is based on the commercial term "side armor protection" used by Polaris to describe a similar class or kind of merchandise in its exclusion application. *See* Pl. SOF at No. 22, 23, 24, 26, 28; Def. Response to Pl. SOF at No. 22, 23, 24, 26, 28; Pl. Reply to Def. Response to Pl. SOF at No. 22, 23, 24, 26, 28.

Furthermore, Defendant has mischaracterized the importance of the "common in commerce" phrase. The initial reference to this phrase, as written in *Nidec Corp. v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995), is that an *eo nomine* provision "describes a commodity by a specific name, ***usually one common in commerce***." The inclusion of the descriptor "usually" clearly indicates that the phrase is explanatory, and—prior to the Defendant's reply brief—it has not been interpreted to be an absolute requirement to defining whether a tariff term is an *eo nomine* provision.

Defendant also somewhat bizarrely states the following: "In fact, plaintiff defined the phrase 'side protective attachments' by defining each of its constituent terms separately." Def. Brief 14. There is absolutely no explanation from the Defendant as to how, if at all, this is relevant to Defendant's argument. Moreover, Plaintiff's methodology is ***precisely*** how an *eo nomine* provision is to be interpreted and analyzed. Specifically, "[i]n an *eo nomine* analysis, the court first construes the headings at issue as a matter of law by ***enumerating and defining each named element of the headings***; the court then moves to the second classification step, a factual inquiry, to determine whether the subject merchandise fulfills each element of a properly-construed

heading." *GRK Can., Ltd. v. United States*, 773 F.3d 1282 (Fed. Cir. 2014) (Reyna, J. and Wallach, E. dissenting) (emphasis added); *See also, e.g.*, *R.T. Foods, Inc. v. United States*, 757 F.3d 1349 (Fed. Cir. 2014); *Link Snacks, Inc. v. United States*, 742 F.3d 962 (Fed. Cir. 2014). This is exactly what Plaintiff did: it enumerated and defined each named element of the "side protective attachments" exclusion, and demonstrated which facts on the record support a finding that the subject merchandise fulfills each element of the exclusion. Thus, Plaintiff has properly applied an *eo nomine* analysis and showed that the "side protective attachments" exclusion applies to the subject merchandise.

### V.    Defendant Has Not Shown What the Principal Use of the Subject Merchandise Is and Has Not Satisfied the *Carborundum* Factors

Plaintiff disagrees that the exclusion that is the subject of this action is a "principal use" provision. If the Court finds otherwise, Defendant has not established that "protection" is not the principal use of the subject merchandise. Specifically, Defendant states that "[p]rincipal use provisions 'call for a determination as to the group of goods that are commercially fungible with the imported goods in order to identify the use which exceeds any other single use.'" Def. Brief at 16. Further, defendant states that "[t]he Court must consider the '*Carborundum* factors' in determining which goods are commercially fungible with the imported goods." Def. Brief at 16. These factors include:

> [The] use in the same manner as merchandise which defines the class; the general physical characteristics of the merchandise; the economic practicality of so using the import; the expectation of the ultimate purchasers; the channels of trade in which the merchandise moves; the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; and the recognition in the trade of this use.

Def. Brief at 16. Defendant concludes that "[h]ere, the application of the *Carborundum* factors demonstrates that Keystone's step bars are not commercially fungible with 'side protective attachments,' but are instead commercially fungible with other truck steps, step bars, side steps,

running boards, and footboards which are primarily used for facilitating entry into and exit from the vehicle cab of high road clearance vehicles." Def. Brief at 16.

Additional U.S. Rule of Interpretation 1(a) states that a tariff classification controlled by use "is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, *of goods of that class or kind* to which the imported goods belong," and the controlling use is the principal use. The most often applied method of determining the "class or kind" that defines the merchandise is to apply the factors set forth in *United States v. Carborundum Co.*, 536 F.2d 373, 377 (C.C.P.A. 1976), noted above. *See, e.g.*, *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1377 (Fed. Cir. 2011).

There are several critical flaws undermining Defendant's fundamental arguments under this section, the most flagrant of which are that: (1) Defendant has failed to establish a meaningful explanation of the class or kind of merchandise that is known as "side protective attachments"; and (2) it has failed to explain why that should be treated as a distinct class or kind of merchandise from so-called "step bars." Rather, Defendant created an *ad hoc* group of products, consisting of other "truck steps," "step bars," "side steps," "running boards," and "footboards." Def. Brief 3-4. It then proclaimed this collection of articles to be a separate and distinct class or kind of merchandise from "side protective attachments," without explaining why all these products belong in a different class or kind of merchandise or what—apparently other than the presence of step features—causes them to be distinguished as such.

First of all, there is no place anywhere in the HTSUS where this *ad hoc* collection of attachments exists. As Plaintiff notes earlier, the Court is not tasked with answering the question of whether KAO's subject merchandise is classified in a tariff provision for "step bars" or in a tariff provision for "protective attachments." There is no tariff provision for "step bars" in the

HTSUS. Defendant serves no purpose by trying to assemble or characterize a fictitious class or kind of merchandise out of the above group of products, when the question is whether they meet the description of "side protective attachments."

Moreover, Defendant misleads the Court by constantly referring to the subject merchandise as "step bars" instead of nerf bars, side bars, or bars. Specifically, it has been established that the subject merchandise is classified in KAO's look-up system as a "nerf bar" as the product type. *See* Pl. Response to Def. SOF at No. 1. Plaintiff's use of interchangeable terms for KAO's nerf bars, side bars, and bars has no bearing on the use or functionality of the subject merchandise. Regardless of the product name, the subject merchandise exhibit features that serve as a step and, no less importantly, protect the side of the vehicle to which it is attached. Defendant misleads the Court by omitting the evidence that addresses the protective features of the subject merchandise. *See* Pl. SOF at No. 18, 18.a, 18.b, 18.c, 18.d, 18.e, 30, 32, 33; Def. Response to Pl. SOF at No. 18, 18.a, 18.b, 18.c, 18.d, 18.e, 30, 32, 33; Pl. Response to Def. SOF at No. 14, 16; Pl. Reply to Def. Response to Pl. SOF at No. 18, 18.a, 18.b, 18.c, 18.d, 18.e, 30, 32, 33.

Furthermore, if the Court decides that the subject exclusion is one based on principal use, and that a *Carborundum* analysis is warranted, summary judgment would not be appropriate. The Defendant devotes a substantial portion of its brief into outlining the *Carborundum* factors and fashioning arguments as to how those factors seem to equate KAO's products to so-called "step bars."  However, there are insufficient undisputed facts on the record pertaining to a *Carborundum* analysis that is actually relevant to the Section 301 exclusion provision, such that a ruling could not be made solely as a question of law. *See* USCIT Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is *no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of law").

Notably, the Government did not frame its *Carborundum* analysis to focus on to whether the subject merchandise *does not* fall within the class or kind of merchandise known as "side protective attachments": the language that actually exists in the Note 20 exclusion provisions. Rather, Defendant invented a class or kind of merchandise that it called "step bars," (also including "truck steps … side steps, running boards, and footboards" in that category, none of which are at issue in this case) which it then summarily pronounced with little to no evidence is a distinct class or kind of merchandise from "side protective attachments."

Having built this false dichotomy, Defendant then spent the majority of its brief explaining why KAO's subject merchandise must be akin to the artificial class or kind of merchandise that it called "step bars," and therefore could not possibly be akin to the class or kind of merchandise known as "side protective attachments." Even so, Defendant's analysis of the *Carborundum* factors is minimal, largely relying on the same evidence throughout its analysis as if each of the seven factors addresses the same issue. This illustrates how inconclusive and minimal Defendant's purported evidence is and how inconsistent Defendant is in its argument.

The Court is not being asked to decide whether KAO's subject merchandise are "step bars," and the Defendant has presented absolutely no information as to why its creation must be treated as a distinct class or kind of merchandise from "side protective attachments." Again, the issue before the Court is whether the subject merchandise meets the description of "side protective attachments" as set forth in the Section 301 exclusion provision. Defendant's *Carborundum* analysis is therefore fatally flawed from the outset, and this Court should therefore not find summary judgment in its favor at this junction due to Defendant's misrepresentations, disputed facts, and flawed arguments regarding *Carborundum* analysis identified below.

## A.    The General Physical Characteristics Of The Merchandise

Defendant fails to show that the general physical characteristics of KAO's nerf bars, side bars, and bars prevent the subject merchandise from being in the same class or kind of merchandise as "side protective attachments." In fact, Defendant fails to reference voluminous record evidence, including expert testimony, specifically outlining the protective physical characteristics of KAO's nerf bars, side bars, and bars. *See* Pl. SOF at No. 18, 18.a, 18.b, 18.c, 18.d, 18.e, 30, 32, 33; Def. Response to Pl. SOF at No. 18, 18.a, 18.b, 18.c, 18.d, 18.e, 30, 32, 33; Pl. Response to Def. SOF at No. 14, 16; Pl. Reply to Def. Response to Pl. SOF at No. 18, 18.a, 18.b, 18.c, 18.d, 18.e, 30, 32, 33. Defendant deliberately misleads the Court by forming an argument around the fact that KAO's nerf bars, side bars, and bars are not "side protective attachments" because they have step surfaces. Def. Brief at 17-18. Defendant does nothing to show how stepping features of KAO's nerf bars, side bars, and bars would cause the merchandise to fall outside the class or kind of goods known as "side protective attachments."

Plaintiff does not dispute that the subject merchandise serves partially as a step. However, Plaintiff notes that the design of the subject merchandise was specifically conceived for ***both*** side protection ***and*** facilitating an individual's entry into and exit from a vehicle. In the same way, marketing materials for Polaris' Smittybilt side armor, which caused the language of the exclusion, indicate that it "[p]rovides protection and a step at the same time." Compl. Ex. D. at 31 of 39 (page number references the filing page number).

Defendant also refers to "bars without steps" and how they have a "totally different design." Def. Brief at 18. Defendant fails to explain what "totally different design" means, or how it affects the applicability of the exclusion. Defendant's reference to "bars without steps" is

completely out of context, because the presence of a step on the subject merchandise is not a factor identified in the language of the exclusion. The Court should not draw any inference from Defendant's statement about "bars without steps," because that statement has no bearing on the language or application of the exclusion.

Defendant also references Patent Nos. US7416202B2 and US7717444B2. *See* Def. Brief at 5, 18, and 24. None of these patents cover the subject merchandise. To the extent that these patents relate to the subject merchandise, these patents clearly indicate that the invention provides protection to the side of the vehicle. *See* Pl. Response to Def. SOF at No. 12 and 13.

Finally, Defendant refers to the weight capacity of the "Keystone's TrailFX steps" (again misleading the Court by using incorrect terminology, *i.e.*, "steps"). Defendant fails to show, and in fact cannot show, how weight capacity precludes the subject merchandise from being a "side protective attachment."

One of the key factors that Defendant fails to include is that the plastic step pads account for [[███████████]] in relation to the overall cost of the Subject Merchandise. *See* Pl. SOF at No. 20; Def. Response to Pl. SOF at No. 20; Pl. Reply to Def. Response to Pl. SOF at No. 20. Thus, from a cost perspective, the step pads are [[███████]] component of the subject merchandise, and cannot be considered to support the principal use of KAO's nerf bars, side bars, and bars. On the other hand, the steel bars that (together with fasteners) comprise [[███████]] of the product's cost, are major components that provide protection to the sides of the vehicle. Thus, physical characteristics weigh in favor of KAO's nerf bars, side bars, and bars being "side protective attachments,"

### B.        The Expectations Of The Ultimate Purchasers

Defendant begins its argument in this sub-section by stating the following: "The record is replete with evidence that retail purchasers buy step bars primarily for their design that features step pads and their ability to ease entry into and exit from a vehicle's cab." Def. Brief at 19. This argument has no merit, and completely mischaracterizes the voluminous record evidence that indicates that the subject merchandise is purchased for both protective and stepping features. *See* Pl. SOF at No. 18-20; Def. Response to Pl. SOF at No. 18-20; Pl. Response to Def. SOF at No. 1-8, 14, 15, 17; Pl. Reply to Def. Response to Pl. SOF at No. 18-20. Again, Defendant deliberately ignores voluminous record evidence that contradicts Defendant's position. *See* Pl. SOF at No. 18-20; Def. Response to Pl. SOF at No. 18-20; Pl. Response to Def. SOF at No. 1-8, 14, 15, 17; Pl. Reply to Def. Response to Pl. SOF at No. 18-20. KAO's marketing materials on KAO's online product pages clearly describe the subject merchandise as protective. *See* Pl. SOF at No. 11; Def. Response to Pl. SOF at No. 11; Pl. Reply to Def. Response to Pl. SOF at No. 11. As such, KAO's customers are considering protective features, as well as stepping features, of the subject merchandise when making a purchase. This is further supported by the fact that Defendant concedes that "Keystone's customers are in fact able to access Keystone's online product pages to read the product descriptions, refer to the product pictures, decide if they want to purchase the products, and/or help them purchase the products." Def. Brief at 19. As such, when customers access KAO's online product pages they clearly see the descriptions of protective functions and protective structure of the subject merchandise and make their choice based on these characteristics. Thus, the ultimate purchasers expect to buy KAO's nerf bars, side bars, and bars to provide protection to the side of the vehicle.

### C.    The Channels Of Trade In Which The Merchandise Moves

Defendant concedes that "both step bars and side protective attachments move in similar channels of trade, as the evidence seems to show that both types of products can similarly be bought online or at auto part stores." Def. Brief at 20. Defendant further states that "these similarities have little probative value, given the fact that auto parts are generally sold through such channels." However, Defendant once again misleads the Court and does not describe the full extent of the evidence proffered by Defendant itself.

The A&A Auto Stores website referenced by Defendant actually shows that both nerf bars and vehicle protection are housed under the same "Exterior" sub-category of products. *See* Def. Exs. 8, 9, 10, and 11. Additionally, A&A Auto Stores website proffered by Defendant clearly shows that "nerf bars" and "steps" are sold as two separate categories of merchandise. *See* Def. Exs. 10 and 11. While Defendant has failed to establish the fact that "protective attachments" and "steps" are separate classes or kinds of merchandise, or that such a distinction is even necessary or warranted in this analysis, the evidence it chooses to reference in this section undermines its argument that "nerf bars" must be treated as "steps" and not "protective attachments." Thus, channels of trade support Plaintiff's position that KAO's nerf bars, side bars, and bars are not "steps" but rather "side protective attachments" which also serve as steps.

### D.    The Environment Of Sale

Defendant concedes that "there is no evidence regarding any accompanying accessories for the step bars and bars without steps." Def. Brief 21. Otherwise, Defendant does nothing to show that the manner in which the subject merchandise is sold is inconsistent with treating the merchandise as "side protective attachments." Notably, the "Vehicle Protection" sub-category on A&A Auto Stores website does not include an explicit reference to the term "side protective

attachments." *See* Def. Exs. 8, 9, 10, and 11. Thus, while Plaintiff rejects the notion that the placement of its goods on one online retailer's website has any relevance to its eligibility for a Section 301 exclusion provision, the lack of KAO's subject merchandise from that section of A&A Auto Stores's website is not representative of Defendant's position.

### E.  Use In The Same Manner Which Defines The Class

Defendant concedes that the subject merchandise is protective. Def. Brief at 23. Further, Defendant states as follows: "As such, neither the additional protection for grit nor the additional stylish look provided by the step bars reflect their primary purpose or use, which is clearly for their stepping function, as evidenced by Keystone's emphasis on the products' stepping functions." Def. Brief at 23. However, Defendant presents no support for its statement. Defendant does not cite to a single source which indicatively compares protective and stepping use of the subject merchandise. Defendant again misleads the Court by only referencing a singular protection element without referencing numerous others. *See* Pl. SOF at No. 18, 18.b, 18.c, 18.d, 18.e, 32; Def. Response to Pl. SOF at No. 18, 18.b, 18.c, 18.d, 18.e, 32; Pl. Response to Def. SOF at No. 14, 16; Pl. Reply to Def. Response to Pl. SOF at No. 18, 18.b, 18.c, 18.d, 18.e, 32. Plaintiff once again reiterates that both KAO's subject merchandise and Polaris's Smittybilt side armor, which is what led to the existence of the exclusion provision, are **both** protective **and** serve as a step at the same time. *See* Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Pl. Reply to Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33.

Plaintiff also notes that, even if KAO's nerf bars, side bars, and bars provide step functionality, they are going to spend by far most of their time being used in their capacity as *protective* attachments. In comparing the step functionality of a nerf bar to its protective functionality, the user would logically use the bars as a "step" only when entering and exiting the

vehicle – something that happens in a matter of seconds. In contrast, KAO's subject merchandise serves a protective function whenever the vehicle is being driven, or parked in a situation that risks damage to the exterior if not for the protective attachments (*e.g.*, in a grocery store parking lot). *See* Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Pl. Reply to Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33. To the extent that this *Carborundum* factor considers the relative time that a product spends performing a particular use, this *Carborundum* factor weighs heavily ***in favor of*** treating the subject merchandise as "protective attachments"—what they spend most of their time doing—rather than as a step for the driver or passenger.

### F.    Economic Practicality Of The Specified Use

Defendant concedes that there is no evidence addressing this factor one way or another. Def. Brief at 25. However, Defendant again cherry-picks singular statements about the subject merchandise's step features, and completely ignores the entirety of the evidence in the case regarding the protective features of the subject merchandise. *See* Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33; Pl. Reply to Def. Response to Pl. SOF at No. 16, 18, 30, 31, 32, and 33. As explained in previous sub-section, *infra*, KAO's subject merchandise logically spends more time serving a protective function rather than being a step. Thus, economic practicality points to the fact that KAO's nerf bars, side bars, and bars are "side protective attachments."

### G.    Recognition In The Trade Of The Specified Use

Defendant concedes "there is no evidence of industry-specific specifications for step bars whose principal use is for stepping or for bars without steps whose principal use is for protection." Def. Brief at 26. Here again, Defendant appears to distinguish between bars with steps and bars

without steps, implying that the only "side protective attachments" that it would consider to be eligible for the Section 301 exclusion are those side protective attachments that do not have step features. However, such a condition does not exist in the subject exclusion, and reading such a condition into the exclusion by means of a principal use analysis amounts to an unwarranted and impermissible restriction on the exclusion's application. Also, such a condition ignores the fact that the underlying product that resulted in the language of the exclusion (Polaris Smittybilt side armor – *see* Figure 2 above) actually contained step features.

The subject exclusion does not cover "side protective attachments without steps or step features." It simply applies to "side protective attachments," and any side protective attachments that meet the terms of that exclusion—regardless whether they also contain step pads, step surfaces, or such similar features—qualify for its use.

Finally, Defendant continues to issue statements in this section that are so cherry-picked and taken out of context as to be misleading the Court. With respect to its characterization of "running boards, nerf bars, and side bars found in the industry," Defendant states that all "are described as having the same function—allowing an individual to step into and out of a vehicle's cab more easily." Def. Brief at 26. Once again, Defendant misleads the Court by failing to include numerous other industry descriptions of nerf bars as protective. *See* Pl. Response to Def. SOF at No. 2, 3, 4, 5, 7.

In sum, Defendant has failed to demonstrate that the subject merchandise is not fungible with the class or kind of merchandise known as "side protective attachments." Its *Carborundum* analysis is incomplete, littered with duplicative references to limited evidence that misconstrues the broader base of the record before the Court, and fails to establish that the Court can properly perform a *Carborundum* analysis as a matter of summary judgment. Therefore, if the Court

concludes that the Section 301 exclusion for "side protective attachments" is a principal use provision—a conclusion that Plaintiff again asserts is not consistent with the language of the exclusion nor with the USTR's instructions for interpreting Section 301 exclusion language—it must hold that summary judgment is not appropriate at this time.

## VI.    Conclusion

As Plaintiff demonstrated above, subject nerf bars, side bars, and bars meet the description of "[t]ire carrier attachments, roof racks, fender liners, *side protective attachments, the foregoing of steel (described in statistical reporting number 8708.29.5060)*." *See* U.S. Note 20(iii)(213). For all the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's cross-motion for summary judgment, grant our motion for summary judgment classifying the subject merchandise under primary subheading 8708.29.5060, HTSUS, and secondary heading 9903.88.56, HTSUS, (free of the Section 301 tariff) and grant Plaintiff such other and further relief as may be just and appropriate.

Respectfully submitted,

Dated:    April 8, 2024

Eric R. Rock, Attorney

Serhiy Kiyasov
Michael G. Hodes
Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6191 (telephone)
erock@rocktradelaw.com (e-mail)

*Counsel For Plaintiff Keystone Automotive Operations, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Eric R. Rock, hereby certify that this response/reply brief complies with the 14,000 word-count limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) because this brief contains 10,226 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted,

Dated:   April 8, 2024

_____
Eric R. Rock, Attorney

Michael G. Hodes
Serhiy Kiyasov
Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6191 (telephone)
erock@rocktradelaw.com (e-mail)

*Counsel For Plaintiff Keystone Automotive Operations, Inc.*

## **CERTIFICATE OF SERVICE**

I, Eric R. Rock, one of the attorneys for the plaintiff, certify that copies of the Plaintiff

Keystone Automotive Operations, Inc.'s Motion for Summary Judgement and Memorandum in

Support thereof, Declaration of Counsel, Statement of Undisputed Facts, and Exhibits were

served on all parties by sending a copy via the U.S. Court of International Trade's CM/ECF

System and email, this Monday, April 8, 2024, addressed to each party or its attorney of record

at the address(es) listed below.


Brandon A. Kennedy
U.S. Department of Justice
International Trade Field Office
*Lead Attorney*
Brandon.A.Kennedy@usdoj.gov




Dated: ___April 8, 2024___

_____
Eric R. Rock, Attorney

Michael G. Hodes
Serhiy Kiyasov
Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6191 (telephone)
erock@rocktradelaw.com (e-mail)

*Counsel For Plaintiff Keystone Automotive Operations, Inc.*