## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  HON. JENNIFER CHOE-GROVES, *JUDGE*

---

KEYSTONE AUTOMOTIVE OPERATIONS, INC.,  :
                                       :
                        Plaintiff,     :        Court No. 21-00215
                                       :
              v.                       :        **PUBLIC**
                           :           :
UNITED STATES,                         :
                                       :
                        Defendant.     :
                                       :

---

### DEFENDANT'S REPLY MEMORANDUM IN FURTHER
### SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*:                          BRANDON A. KENNEDY
Valerie Sorensen-Clark                 Trial Attorney
General Attorney                       Civil Division, U.S. Dept. of Justice
Office of the Assistant Chief Counsel  Commercial Litigation Branch
International Trade Litigation          26 Federal Plaza, Room 346
U.S. Customs and Border Protection     New York, New York 10278
New York, New York 10278               Tel.: (212) 264-9230
                                       *Attorneys for Defendant*

Dated: May 29, 2024

**TABLE OF CONTENTS**

INTRODUCTION............................................................................................................1

ARGUMENT.................................................................................................................2

  I.  THE TERM "SIDE PROTECTIVE ATTACHMENTS" DESCRIBES
     MERCHANDISE WITH A COMMON PRINCIPAL USE...............................................2

  II.  THE PRINCIPAL USE OF KEYSTONE'S STEP BARS IS AS STEPS FOR
      ASSISTING WITH ENTRY INTO AND EXIT FROM A VEHICLE, AND
      THEREFORE THEY DO NOT QUALIFY AS "SIDE PROTECTIVE
      ATTACHMENTS" UNDER THE TERMS OF THE SECTION 301 EXCLUSION ......9

        a.  The General Physical Characteristics Of The Merchandise.............................11

        b.  The Expectations Of The Ultimate Purchasers................................................13

        c.  The Channels Of Trade In Which The Merchandise Moves...........................15

        d.  The Environment Of Sale ...............................................................................16

        e.  Use In The Same Manner Which Defines The Class .......................................17

        f.  Economic Practicality Of The Specified Use ..................................................19

        g.  Recognition In The Trade Of The Specified Use ............................................20

  III.  THE SCOPE OF AN EXCLUSION IS NOT GOVERNED BY THE PRODUCT
       DESCRIPTIONS IN ANY PARTICULAR REQUEST FOR EXCLUSION ..............20

CONCLUSION.............................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Aromont USA, Inc. v. United States*,
   671 F.3d 1310 (Fed. Cir. 2012)...............................................................9, 15, 20

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
   326 F.3d 1215 (Fed. Cir. 2003)............................................................19

*Dependable Packaging Solutions, Inc. v. United States*,
   757 F.3d 1374 (Fed. Cir. 2014)...............................................................9

*Ford Motor Company v. United States*,
   926 F.3d 741 (Fed. Cir. 2019)..............................................................12

*Nat'l Advanced Sys. v. United States*,
   26 F.3d 1107 (Fed. Cir. 1994)...............................................................2

*Lenox Collections, a div. of Lenox, Inc. v. United States*,
   20 C.I.T. 194, 1996 WL 47155 (Ct. Int'l Trade 1996)....................................16, 17

*Orlando Food Corp. v. United States*,
   140 F.3d 1437 (Fed. Cir. 1998)............................................................3, 4, 6

*SC Johnson & Son Inc. v. United States*,
   999 F.3d 1382 (Fed. Cir. 2021)...........................................................4, 5, 6, 7

*Stewart-Warner Corp. v. United States*,
   748 F.2d 663 (Fed. Cir. 1984)...........................................................4, 5, 7, 8

*United States v. Carborundum Co.*,
   63 CCPA 98, 536 F.2d 373 (1976).......................................................9, 10, 11

**Statutes**

Section 301 of the Trade Act of 1974, Pub. L. 93-618, 19 U.S.C. § 2411..........................1, 2, 9

**Regulations**

*Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property and Innovation*,
85 Fed. Reg. 48,601 (Aug. 11, 2020)..................................................6, 21

**Harmonized Tariff Schedule of the United States**

General Rule of Interpretation 1 ............................................................9

General Interpretative Rule 10(e)–(i) .................................................................................. 7

ARI 1(a) ............................................................................................................................. 3, 9

Chapter 87

    Heading 8704 .............................................................................................................. 12

Chapter 99

U.S. Note 20(iii) to chapter 99 .......................................................................................... 6

U.S. Note 20(iii)(213) to Chapter 99 ................................................................................ 6

U.S. Note 20(iii)(213) to Subchapter III of  Chapter 99 ................................................... 9

    Heading 9903

        Subchapter 9903.88.56 .......................................................................................... 6

**Rules**

USCIT Rule 30(b)(6) ......................................................................................................... 11

USCIT Rule 56.3 ................................................................................................................. 2

USCIT Rule 56.3(a) ............................................................................................................ 2

USCIT Rule 56.3(b) ............................................................................................................ 2

**Other Authorities**

ATTACHMENT, *Oxford Languages,*
https://www.google.com/search?q=attachment+definition ...................................................... 5

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  HON. JENNIFER CHOE-GROVES, *JUDGE*

| | |
|---|---|
| KEYSTONE AUTOMOTIVE OPERATIONS, INC., : | |
| : | |
| Plaintiff, : | Court No. 21-00215 |
| : | |
| v. : | **PUBLIC** |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant. : | |
| : | |

**DEFENDANT'S REPLY MEMORANDUM IN FURTHER
SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States (the Government), submits this memorandum in reply to plaintiff's, Keystone Automotive Operations, Inc. (Keystone), response to our cross-motion for summary judgment.  As further shown below, summary judgment in favor of defendant is appropriate because there are no genuine issues of material fact, and the undisputed facts show that defendant is entitled to judgment in its favor as a matter of law.

## INTRODUCTION

In our cross-motion, we established that the subject merchandise consists of step bars that are not covered by an exclusion from additional 25 percent *ad valorem* duties assessed under Section 301 of the Trade Act of 1974 (Pub. L. 93-618, 19 U.S.C. § 2411) (Section 301).
The undisputed facts show that Keystone's imported products are: 1) rubberized plastic steps mounted on steel bars, 2) that attach to the sides of vehicles, and 3) whose principal use and function are to assist with entry into and exit from high road clearance vehicles.  Such merchandise is not commercially fungible with "side protective attachments," whose principal use is to provide protection.  Rather, Keystone's merchandise is commercially fungible with step

bars, footboards, running boards, and other apparatus for assisting entry into high road clearance vehicles. Therefore, the subject merchandise is not a "side protective attachment" within the terms of the exclusion to Section 301 duties and does not qualify for this exclusion.

The evidence in the record before the Court demonstrates our position. However, rather than keeping to the merits, Keystone improperly employs objectionable litigation tactics and accuses us of misleading the Court in our discussion of the record evidence. *See* Pl. Reply, 3, 22, 24-25, 27-28, 30. Yet, each of our arguments is supported by the evidentiary record and applicable case law, and Keystone's characterization of our arguments is unfounded. Moreover, Keystone filed a reply to our response to plaintiff's statement of undisputed facts. *See* ECF No. 53-2. This type of reply is not permitted under the Rules of the Court. Plaintiff cites to USCIT Rule 56.3 for its filing; however, no part of Rule 56.3 allows for a separate reply to an opponent's Rule 56.3(b) response to the movant's Rule 56.3(a) statement of facts. Therefore, the Court should disregard plaintiff's reply document (ECF No. 53-2).

## <u>ARGUMENT</u>

## I.    THE TERM "SIDE PROTECTIVE ATTACHMENTS" DESCRIBES MERCHANDISE WITH A COMMON PRINCIPAL USE

As explained in our opening papers, the term "side protective attachment" describes merchandise with a common principal use, rather than describing, *eo nomine*, a commodity by a specific, commonly used name, as plaintiff claims. Pl. Reply, 11-12. Whether a product is covered by the terms of a tariff provision—including, as here, a provision for an exclusion from Section 301 duties—is a two-step process: first, the meaning of terms within the provision must be ascertained, and second, a determination must be made as to whether the merchandise at issue falls within the description of such terms as properly construed. *See Nat'l Advanced Sys. v. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994). If tariff terms are determined to be based on

"principal use," then the terms are governed by ARI 1(a): "[A] tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use."

Plaintiff argues that "[n]o explanation is provided as to how or why describing a commodity 'by a specific name that is common in commerce' became the standard for determining when a provision is eo nomine, nor is one provided for why 'side protective attachments' fail to meet this standard." Pl. Reply, 3. But in our opening papers, see Def. Cross-Mot. at 13-14, we cited to Federal Circuit precedent when we explained that the phrase "side protective attachments" is not an *eo nomine* provision because it does not "describe[] a commodity by a **specific name, usually one common in commerce**." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998) (emphasis added). Moreover, not only is there no evidence in the record that plaintiff or any other businesses in the automotive industry use the generic phrase "side protective attachments" to identify any specific commodity, much less the merchandise at issue, but the evidence in the record shows that the subject merchandise is commonly referred to as truck steps, step bars, steps, side steps, nerf bars with steps, or side bars with steps. *See* Def. SOF, ¶¶ 1, 15, 21; Def. Resp., ¶¶ 12, 19.

Plaintiff argues that USTR's use of the term "side protective attachments" is evidence that the phrase is a specific name for a commodity. Pl. Reply, 19. Yet plaintiff does not, and cannot, point to any evidence in the record that Keystone or anyone else in the automotive industry uses that term, let alone uses it widely in commerce. *See Orlando*, 140 F.3d at 1441. However, the language of the exclusion and the case law governing principal use indicate that the USTR employed the phrase "side protective attachments" as a generic phrase to specify a

3

particular set of products based on their principal use as parts that attach to the sides of vehicles and provide protection.

Plaintiff also claims that it "has clearly shown that the term 'side protective attachment,' introduced by USTR in the Federal Reister [*sic*] Notice, is based on the commercial term 'side armor protection' used by Polaris to describe a similar class or kind of merchandise in its exclusion application." Pl. Reply, 19. We disagree. Plaintiff has not provided evidence of why the USTR specifically selected the language "side protective attachments" nor why it did not use the phrase "side armor protection" for the language of the exclusion. *See* Pl. Reply, 19. Notably, unlike Polaris, Keystone does not refer to the subject merchandise as side "armor protection." Rather, Keystone consistently and primarily highlights the stepping functions of the subject merchandise.

Regardless, there is no record evidence that the term "side protective attachments" in the subject exclusion is a *specific name* for a commodity, or a name that is usually common in commerce. *See Orlando*, 140 F.3d at 1441. Principal use is a relevant consideration in construing the meaning of a tariff term, particularly here, when the relevant language comprises adjectives modifying a generic term. *See*, *e.g.*, *Stewart-Warner Corp. v. United States*, 748 F.2d 663, 668 (Fed. Cir. 1984) (discussing a provision for "bicycle speedometers," the court held, "We have held otherwise above—*i.e.*, that the intent of Congress was not clear and the chief use rule of construction applies.").

Moreover, inherent in the term "protective," an adjectival form of the verb "protect," is the notion that the generic objects involved (*i.e.*, attachments) are destined for a specific use (*i.e.*, protecting or providing protection). *See Orlando*, 140 F.3d at 1441; *SC Johnson & Son Inc. v. United States*, 999 F.3d 1382, 1389 (Fed. Cir. 2021) ("***generic terms preceded by an adjective***

*suggesting a manner of use can constitute principal use provisions*") (emphasis added, citing *Stewart-Warner*, 748 F.2d at 667 (explaining that the TSUS term encompassing "bicycle speedometers" was "a term 'controlled by use' . . . because the noun 'bicycle' acts as an adjective modifying 'speedometer' in a way that implies use of the speedometer on a bicycle")).

In addition, the court in *SC Johnson* explained that the phrase "household utensil" "could be construed as a use provision" because "the term 'utensil,' like the term 'toy,' suggests a specific use[.]" 999 F.3d at 1389 (explaining that one definition of the term "utensil" is "an implement, instrument, or vessel used in a household and especially a kitchen"). Similarly, as relevant here, Oxford Languages defines "attachment" as "1. an extra part or extension that is or can be attached to something *to perform a particular function*." *Attachment*, Oxford Languages, *available at* https://www.google.com/search?q=attachment+definition (last viewed May 7, 2024) (emphasis added). Like the definitions for "utensil" and "toy," the definition of "attachment" "suggests a specific use" or particular function. *See SC Johnson*, 999 F.3d at 1389. And here, the language of the exclusion identifies the specific uses for the attachments, *i.e.*, side and protective. As such, the phrase "side protective attachments" is properly interpreted as a principal use provision that signifies that the exclusion is available to attachments to the sides of vehicles that are principally used to provide protection. And as we have shown in our opening papers, the imported parts are attachments for the sides of vehicles that are principally used to assist with entry into and exit from high road clearance vehicles.

Plaintiff disregards the relevant case law as well as the GRIs and ARIs in interpreting the exclusion at issue, arguing that "the USTR's Federal Register Notice instructions do not indicate that a principal use analysis is an inherent part of analyzing an exclusion's applicability." Pl. Reply, 13. Plaintiff, however, concedes that, in order to determine the applicability of the

exclusion, "U.S. Note 20(iii)(213) to Chapter 99, HTSUS" must be applied. *Id.* at 5. In other words, the exclusion is incorporated into the HTSUS, specifically under secondary heading 9903.88.56, and as such, the terms are interpreted using the GRIs and ARIs, including the interpretative tool of principal use, where appropriate, such as here. Plaintiff has not cited to any legal standard showing that the interpretation of exclusion provisions is not subject to the normal interpretative tools of the tariff statute (the GRIs, ARIs, and case law), all of which instruct how to interpret the headings and subheadings of the HTSUS, including exclusions.

Plaintiff further argues that "neither the *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601, nor any other relevant Federal Register Notices, dictate when or how the various exclusions must be considered as *eo nomine* provisions or exclusions based on principal or actual use." Pl. Reply, 12. Plaintiff further "maintains that each exclusion stands for itself, and there are no inherent additional characteristics, qualifications, or limitations that should be read into the language of the exclusion." *Id.* But as we have explained above, because the exclusions are incorporated into the HTSUS (here, via secondary heading 9903.88.56 and U.S. Note 20(iii) to Chapter 99 of the HTSUS), the legal framework for interpreting the HTSUS applies to the exclusions. We are not imposing any additional characteristics, qualifications, or limitations in interpreting the phrase "side protective attachments." On the contrary, it is simply an exercise in applying the GRIs, ARIs, and the relevant holdings of cases like *Orlando* and *SC Johnson* to the language of the exclusion.

Plaintiff also argues that the term "side protective attachments" is "a specific name" for an article, and that therefore the provision must be *eo nomine*. Pl. Reply, 13. Even if we assumed this to be true (which it is not, as we demonstrated above), plaintiff's argument would not be the end of the *eo nomine* versus principal use inquiry. *See Orlando*, 140 F.3d at 1441; *SC*

*Johnson*, 999 F.3d at 1389; *Stewart-Warner*, 748 F.2d at 667. For example, in *Stewart-Warner*, the court considered the tariff term "bicycle speedometers"—which is specific and arguably commonly found in commerce. The court explained as follows:

> Logic indicates that "bicycle speedometers" is a term "controlled by use," as General Interpretative Rule 10(e)–(i) provides, because the noun "bicycle" acts as an adjective modifying "speedometer" in a way that implies use of the speedometer on a bicycle. If the modifying word or words were purely descriptive—*i.e.,* a "green" speedometer or a "three-inch-in-diameter" speedometer—then the question of use would not arise. However, by employing the term "bicycle" to modify "speedometer," logic compels one to consider some aspect of use.

748 F.2d at 667. Importantly, the court added that "[t]he word 'use' or the words 'chiefly used' ***need not themselves appear*** in the tariff item[,]" contrary to plaintiff's argument. *Id.* (emphasis added); *see* Pl. Reply, 13. Applying the same logic from the Federal Circuit, the exclusion terms "side" and "protective" are adjectives which are not purely descriptive, such as relating to color or size, but are instead adjectives that modify the term "attachments" in a way that implies a particular—*i.e.*, principal—use of the attachments, *i.e.*, principally used on the sides of vehicles and principally used for protection. *See Stewart-Warner*, 748 F.2d at 667.

Plaintiff implies that because the terms "solely or principally used" were not specifically included in the exclusion at issue here, that the Court should ignore the ARIs and the Federal Circuit precedent. *See* Pl. Reply, 14. Arguably, the drafters of the bicycle speedometers provision could have drafted it to read "speedometers principally used on bicycles," but the choice of the drafters to use different terms did not compel the Federal Circuit to disregard the consideration of use. *See Stewart-Warner*, 748 F.2d at 667. Similarly, here, the most logical way to read a provision that is less specific than

7

"bicycle speedometers," and which actually employs not one, but two adjectives to modify the term "attachments," is by observing that both adjectives signal consideration of use in the provision.

Plaintiff also concedes that the term "protective" indicates "that the product has the character or quality of ***covering or shielding something from exposure, injury, damage, or destruction***." Pl. Reply, 17 (emphasis added). But contrary to plaintiff's characterization of the term "protective" as purely descriptive, see Pl. Reply at 17, the language highlights the *use* or *function* evoked by the term "protective." In other words, something that is "protective" is something whose use or function is to provide protection, *i.e.*, covering or shielding something from exposure, injury, damage, or destruction. In contrast, purely descriptive adjectives such as colors or sizes do not signal any type of use or function: no particular use or function is apparent from something labeled "green" or "three-inch-in-diameter." *See Stewart-Warner*, 748 F.2d at 667. In contrast, nouns or verbs which are transformed into adjectives often do signal a particular use or function, such as "bicycle" in "bicycle speedometer" or "side" and "protective" in "side protective attachments." Finally, as explained above, the Federal Circuit has also suggested that when the intent of the drafters of a tariff provision is unclear, it may provide further support for construing a tariff provision, such as one that includes adjectives modifying a generic term, as one indicating principal use. *See Stewart-Warner*, 748 F.2d at 668. For all these reasons, the proper interpretation of the exclusion provision requires a consideration of use.

Once it is determined that use should be considered, the ARIs indicate that principal use—the use which exceeds any other single use—is the appropriate legal framework for

analysis. *See Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1316 (Fed. Cir. 2012). As such, pursuant to GRI 1 and ARI 1(a), the exclusion for "side protective attachments" provided for in U.S. Note 20(iii)(213) to Subchapter III of Chapter 99, HTSUS, is a principal use provision. Therefore, imported merchandise consisting of vehicle attachments whose principal use is as side attachments to provide protection qualifies for the exclusion. But because the principal use of Keystone's imported side step attachments is not to provide *protection*, but instead to *assist with entry* into high road clearance vehicles, the subject merchandise does not qualify for the exclusion.

## II.    THE PRINCIPAL USE OF KEYSTONE'S STEP BARS IS AS STEPS FOR ASSISTING WITH ENTRY INTO AND EXIT FROM A VEHICLE, AND THEREFORE THEY DO NOT QUALIFY AS "SIDE PROTECTIVE ATTACHMENTS" UNDER THE TERMS OF THE SECTION 301 EXCLUSION

As we explained in our opening papers, principal use provisions "call for a determination as to the group of goods that are commercially fungible with the imported goods in order to identify the use which exceeds any other *single* use," and the Court must consider the "*Carborundum* factors" in making this determination. *Dependable Packaging Solutions, Inc. v. United States*, 757 F.3d 1374, 1379 (Fed. Cir. 2014) (emphasis in original) (internal citations omitted); *United States v. Carborundum Co.*, 63 CCPA 98, 536 F.2d 373, 377 (1976). As we demonstrated in detail in our opening papers, the application of the *Carborundum* factors shows that Keystone's step bars are not commercially fungible with "side protective attachments," but are instead commercially fungible with other truck steps, step bars, side steps, running boards, footboards, and apparatus for assisting entry into high road clearance vehicles. *See*, *e.g.*, *Dependable* at 1381 (holding that the trial court correctly concluded that the actual use of the vases at issue was primarily decorative).

Plaintiff argues that we have "failed to establish a meaningful explanation of the class or kind of merchandise that is known as 'side protective attachments[.]'" Pl. Reply, 21. Not so. In our opening papers, we established that the merchandise functions as truck steps, step bars, side steps, footboards, running boards, and other apparatus principally used for assisting entry into high road clearance vehicles. Def. Cross-Mot., 16-27. Keystone frequently calls the subject merchandise "step bars" and "side steps" in both its internal documents and in its marketing documents intended for customers, and all of Keystone's imported step bars consist of rubberized plastic step features (step pads) mounted on steel tubes. Def. SOF, ¶ 1 (*see also* Pl. Ex. D, at 14:4-11, 46:6-14, and 115:21-117:4); Def. Resp., ¶¶ 12, 19. As such, the evidence in the record shows that the merchandise is commonly known as "step bars" and "side steps" in commerce, such that they do not qualify for the exclusion for "side protective attachments." In addition, we have established that the class or kind of merchandise for "side protective attachments" is attachments of a kind principally used on the sides of vehicles for protection. Further, as we have explained in our opening papers, the evidence in the record and a *Carborundum* analysis show that the subject imports are not principally used for protection. Def. Cross-Mot., 16-27. Therefore, the imported step bars cannot be considered "side protective attachments" and thus do not qualify for the exclusion.

Plaintiff challenges why truck steps, step bars, side steps, running boards, footboards, and apparatus for assisting entry into high road clearance vehicles are distinct from "side protective attachments." *See* Pl. Reply, 21. Pursuant to the exclusion provision at issue, a class of goods consisting of vehicle side attachments principally used for *stepping* **must be** a separate and distinct class of goods from those covered by the provision for vehicle side attachments principally used for *protection*. The purpose of exclusion provisions is to provide for relief from

duties, but only for the specific goods identified in the exclusions. As we have explained, the exclusion does not read "side attachments" or "side step attachments." To give effect to the provision in full, side attachments which do not principally provide for protection—such as the subject merchandise—cannot be covered by a provision for "side protective attachments." As such, side attachments that principally assist with entry into high road clearance vehicles cannot belong to the same class of goods as side attachments that principally provide protection.

Below, defendant responds to the various arguments by Keystone regarding each of the *Carborundum* factors.

### A. The General Physical Characteristics Of The Merchandise

Plaintiff argues that "the design of the subject merchandise was specifically conceived for ***both*** side protection ***and*** facilitating an individual's entry into and exit from a vehicle." Pl. Reply, 24 (emphasis in original). Nevertheless, the evidence in the record shows that the design of the subject merchandise ***firstly and primarily*** involves the products' stepping functions for assisting with entry into vehicles. *See* Def. Cross-Mot., 16-18. Specifically, when questioned about side bars without steps, and after agreeing that "there's other manufacturers who also sell bars that don't have steps," see Def. Ex. 1, Fabbro Depo., at 22:9-11, plaintiff's designated agent pursuant to USCIT Rule 30(b)(6), Mr. Justin Fabbro, testified that side bars that lack steps involve "a totally different design." Def. SOF, ¶¶ 9-10 (*see also* Def. Ex. 1, Fabbro Depo., at 23:19-20 ("Typically, without steps, it's a totally different design.")). Mr. Fabbro then explained what "a totally different design" means, indicating that those bars without steps "sit[] closer to the vehicle, more for rock crawling and aggressive or more aggressive applications[,]" as compared to the step bars imported by Keystone. Def. SOF, ¶¶ 9-10 (*see also* Def. Ex. 1, Fabbro Depo., at 23:20-22). Because such bars without steps have a different design and thus, by

definition, have different physical characteristics, those products are not commercially fungible with step bars that feature step pads or stepping surfaces and are principally used for assisting with entry into vehicles.

Plaintiff also claims that Patent Nos. US7416202B2 and US7717444B2, produced by Keystone in response to defendant's request for production No. 5 requesting, *inter alia*, all patents for each imported product, do not "cover the subject merchandise." Pl. Reply, 25. However, in its response to our request, Keystone produced "patents that relate to products **substantially identical to the imported products**," and among these patents, plaintiff produced Patent Nos. US7416202B2 and US7717444B2. Def. Ex. 2, Pl. Resp. to Def. First Request for Prod., No. 5 (emphasis added). Notably, the name of these inventions is "Apparatus *for Assisting Entry* into High Road Clearance Vehicles," and the patents indicate that "the *primary* object" of these inventions is "assist[ing] entry into [a] vehicle['s] passenger compartment." Def. SOF, ¶¶ 11-13 (*see also* Def. Ex. 2, Pl.'s Resp. to Def.'s First Req. for Prod., No. 5; Def. Ex. 3, at 6; Def. Ex. 4, at 6) (emphasis added).

Neither the name of the patented inventions nor the descriptions of their primary objects include "protection." And revealingly, the word "for" in the name of these inventions for substantially identical products indicates a specific, principal use or function for these inventions, much like the word "for" in some tariff provisions indicates a principal use for the products covered in those provisions. *Ford Motor Company v. United States*, 926 F.3d 741, 759 (Fed. Cir. 2019) (holding that HTSUS Heading 8704, which covers "motor vehicles *for the transport of goods*," "is a principal use provision because the heading identifies the chief use of the covered merchandise as of a kind used to transport goods") (emphasis in original). In addition, there is no mention whatsoever of protection in the "Abstract" section of the patents. *See* Def.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

Ex. 3, at 1; Def. Ex. 4, at 1. And in the section for the "Brief Summary of the Invention", the first and second listed objects involve the stepping function, the third listed object is a stylish appearance, and the last listed object identifies a protective function. *See* Def. Ex. 3, at 6; Def. Ex. 4, at 6. As such, the patents for products substantially identical to the subject merchandise, along with the names and descriptions in the patents themselves, show that the subject merchandise's design, physical characteristics, and principal use are similarly "for assisting [with] entry into high road clearance vehicles." Def. SOF, ¶¶ 11-13.

Finally, despite the cost of the step pads on the bars being of [[ ████████ ]] compared to the cost of the steel bars, see Pl. Reply at 25, other factors of its design show that the name and physical characteristics are targeted toward the product's stepping function, including the fact that Keystone's TrailFX steps provide a maximum weight capacity of 300 pounds, which according to the testimony of plaintiff's designated agent, reflects the maximum weight of a person that the steps can bear. Def. SOF, ¶ 23 (*see also* Pl. Ex. B-1, at 55; Def. Ex. 1, Fabbro Depo., at 75:3-16). This further shows that the steel bars that hold the steps are purposefully designed for and include physical characteristics permitting a person weighing up to 300 pounds to step onto the products to enter and exit a vehicle.

Therefore, this factor shows that the principal use of the step bars is for assisting entry into and exit from a vehicle, and not for protection.

**B. The Expectations Of The Ultimate Purchasers**

Keystone deemphasizes the stepping functions of its imported products, despite the fact that in its *marketing products to the ultimate purchasers*—produced prior to the commencement of litigation—Keystone highlights and promotes the stepping function of the imported products over any protection afforded. *Compare* Pl. Reply, 26 *with* Def. SOF, ¶ 15 (Pl. Ex. B-1, at 55,

containing the online product page for the TrailFX A1005B, where Keystone describes this product as a "side step," "step bar," "step," "step product," and "step type"). When asked if "it's fair to say that the primary purpose of these TrailFX step bars is to provide the slip resistant stepping entry and exit points to the cab of the vehicle," Keystone's own expert witness, Mr. Stephen Kozak, replied, "That's how they are being *marketed* by the – in this *brochure* here." Def. SOF, ¶ 16 (*see also* Def. Ex. 5, Kozak Depo., at 83:1-10, 85:15-24; Pl. Ex. B-1, at 55) (emphasis added). Mr. Kozak testified about the appearance of the TrailFX brochure page, which consistently emphasizes stepping functions over the protection afforded—in fact, the paragraph underneath "Product Info" does not include any mention of protection, which is relegated to the penultimate bullet point in the "Features" section ("Provides Moderate Protection"). *See also* Pl. Ex. B-1, at 55 ("TrailFX Step Bars maximize style and safety when entering and exiting your vehicle. Available in various sizes, shapes, and finishes, TrailFX steps offer a solution for every need. Each pair installs seamlessly against the vehicle's contours for a sleek and stylish look. With TrailFX step products, a custom look doesn't have to break the bank.").

Further, Keystone has "social media that [it] collect[s] from customers and how they're using the product," and it "do[es] post that information to help advertise and market [its] products[.]" Def. SOF, ¶ 18 (*see also* Def. Ex. 1, Fabbro Depo., at 95:2-12). Therefore, Keystone has some information on the expectations of the ultimate purchasers, and Keystone uses this information in its marketing materials. *See* Def. SOF, ¶¶ 16, 18. And customers are influenced by the manner in which Keystone (or any vendor, for that matter) describes its products, and the features it highlights and emphasizes, in its online information—in this case, the step pads and stepping functions of the step bars. *See* Def. SOF, ¶ 16.

14

Finally, Keystone's Facebook page for TrailFX products, see Def. SOF, ¶ 19 (*see also* Def. Ex. 6, at 1), shows that the majority—*i.e.*, more than half—of the posts, all of which are published by Keystone, describe Keystone's products as steps, step bars, step boards, or side steps.  Def. SOF, ¶ 21 (*see also* Def. Ex. 6).  This shows that Keystone is attempting to connect with current and potential customers through the description of the merchandise as steps, step bars, step boards, or side steps.

Together, the above facts show that Keystone places value on these descriptions of their step products, and that the expectation of the ultimate purchasers is to use these step bars primarily as steps for assisting with entry into high road clearance vehicles.  As such, this factor supports a holding that the principal use of the step bars is for assisting with entry into high road clearance vehicles.

### C.  The Channels Of Trade In Which The Merchandise Moves

Plaintiff notes that the A&A Auto Stores website "shows that both nerf bars and vehicle protection are housed under the same 'Exterior' sub-category of products."  Pl. Reply, 27.  But all this placement suggests is that nerf bars, side steps, and "Vehicle Protection" parts are for the exterior of a vehicle.  In contrast, plaintiff admits that A&A does not sell Keystone's subject merchandise in the "Vehicle Protection" sub-category.  *See* Pl. Resp. to Def. SOF (ECF 53-1), ¶ 29.

Although there are some notable differences in how side protective attachments and step bars are sold and move in trade, any similarities in the channels of trade have little probative value, given the fact that auto parts are generally sold through such channels.  Def. SOF, ¶¶ 27-29 (Def. Ex. 8; Def. Ex. 9); *see, e.g.*, *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1316 (Fed. Cir. 2012) (holding that the similarities in the channels of trade between the imported

products and preparations for soups and broths proved little, given the fact that most food products are generally sold through such channels).

### D.  The Environment Of Sale

As we demonstrated in our opening papers, the evidence regarding the manner in which the step bars are advertised shows that their primary function is to assist with entry into high road clearance vehicles, and not the moderate protection they afford.  Def. Cross-Mot., 21-23.

Plaintiff argues that "[d]efendant does nothing to show that the manner in which the subject merchandise is sold is inconsistent with treating the merchandise as 'side protective attachments.'"  Pl. Reply, 27.  Yet, plaintiff disregards the significant evidence we have identified in our opening papers that establishes that Keystone advertises its products as foremost providing a stepping, and not a protective, function.  As we explain in our opening papers, Keystone advertises its step bars as "side steps," "step bars," "steps," "step products," and "step types," see Def. SOF at ¶ 15 (see also Pl. Ex. B-1 at 55, "TrailFX Step Bars"), thereby directly emphasizing the stepping features to its customers, even in the name of the product.  Further, as we explained above in Section II.B, Keystone's own expert witness indicated that Keystone markets its products in a way that shows that the primary purpose of the step bars is to provide slip resistant stepping entry and exit points to the cab of the vehicle.  As we noted in Section II.B, even in the online webpage/brochure for the TrailFX Step Bars, Keystone consistently advertises the stepping functions more prominently than the protection element, as reflected, *inter alia*, by the "Product Info" section which lacks any mention of protection, and by relegating protection to the penultimate bullet point in the last section entitled "Features".  In these and the other ways we described in our opening papers, Keystone creates an environment of sale that showcases the stepping function of the step bars. *See Lenox Collections, a div. of Lenox, Inc. v.*

*United States*, 20 C.I.T. 194, 199, 1996 WL 47155 (Ct. Int'l Trade 1996) (finding that although the ads described the merchandise as both decorative and functional, the ads stressed the decorative nature of the containers).  Following the logic in *Lenox*, although Keystone's online brochure describes stepping, style, protective, and other  features of the subject merchandise, the TrailFX Step Bars brochure stresses the stepping functions significantly more than its secondary style features or its tertiary protective function.

Finally, as we explained above in Section II.B and in our opening papers, Keystone's Facebook page for TrailFX products typically describes Keystone's products as steps, step bars, or side steps, which again is reflective of Keystone's practice of promoting the step bars' stepping function in its marketing materials.  Def. SOF, ¶ 21 (*see also* Def. Ex. 6).  And the way in which the A&A Auto Stores website displays "nerf bars," "steps," "step bars," "side steps," and "side step bars" under the "Nerf Bar" sub-category of the Products>Exterior>Nerf Bars & Steps sub-category, demonstrates that the manner in which the step bars are displayed emphasizes their primary function as steps or stepping surfaces, and not the secondary or tertiary protection they afford.  *See* Def. SOF, ¶¶ 27-31.

**E.  Use In The Same Manner Which Defines The Class**

Plaintiff argues, without citing to record evidence, that Keystone's step bars "are going to spend most of their time being used in their capacity as protective attachments."  Pl. Reply, 28. And without citing to any legal authority, plaintiff suggests that "the relative time a product spends performing a particular use" should weigh heavily in the analysis.  Pl. Reply, 29. Plaintiff's analysis is flawed.  The time spent performing a particular activity is meaningless without consideration of context or purpose.  For example, a book that spends most of its time as a paperweight instead of being read should not be viewed or classified as a paperweight and a

stylish convertible car that spends most of its time parked on the driveway should not be viewed or classified as a stylish decoration.  There is no evidence in the record regarding how much time Keystone's products are used for assisting with entry into vehicles versus protective purposes.

But as we have shown above and in our opening papers, this factor strongly suggests that the step bars' ultimate and principal use, consistent with the manner in which other similar bars and boards with steps (like running boards and side steps) or other apparatus for assisting with entry into vehicles are used, is for their stepping function.  This is true even though the step bars also provide some aesthetic value, *e.g.*, "a sleek and stylish look," as well as moderate protection.  Def. SOF, ¶ 24-25 (*see also* Pl. Ex. B-1, at 55).  As such, neither the additional stylish look nor additional moderate protection reflects their principal purpose or use, which is clearly for their stepping function to enter and exit vehicles, as evidenced by Keystone's prominent emphasis on the products' stepping functions.  Documentary evidence provided by Keystone shows that nerf bars are "**essential** for those who want **a safe area to step onto** while exiting or entering a pick-up truck," as they provide "a stepping surface on the entry points of [a] truck," and that "[m]uch like **running boards**, **[nerf bars]** also have the **same** function— allowing [an individual] to get in or out of the truck" more easily.  Def. SOF, ¶¶ 2-8 (*see also* ECF No. 9-1, at 65-66, 69, 75-77) (emphasis added).

Furthermore, side bars that lack steps are used "more for **rock crawling and aggressive or more aggressive applications**" as compared to the step bars imported by Keystone.  Def. SOF, ¶¶ 9-10 (*see also* Def. Ex. 1, Fabbro Depo., at 23:12-22) (emphasis added).  As such, this fact shows that the imported step bars are not commercially fungible with "side protective attachments" such as bars that lack steps and which are used in more aggressive applications which would require a more protective function.

Additionally, Patent Nos. US7416202B2 and US7717444B2 submitted by Keystone, and which relate to the design and physical characteristics of "products **substantially identical** to the imported products," indicate that "[t]he **primary** object" of these inventions is "assist[ing] entry into [a] vehicle['s] passenger compartment." Def. SOF, ¶¶ 11-13 (emphasis added). This undisputed evidence is compelling. *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 326 F.3d 1215, 1221-1222 (Fed. Cir. 2003) (explaining that "[i]n construing [patent] claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention[,]'" and holding that "[t]he patent certainly contemplates that a **principal use** of the invention is to allow a surgeon to operate at some distance" (emphasis added)).

Finally, as explained above in Sections II.B and D, Keystone's Facebook page for TrailFX products shows how current customers use its products. As noted above, the majority of the posts describe Keystone's products as steps, step bars, or side steps, which supports a holding that the imported products are principally used as steps, running boards, footboards, and other apparatus for assisting with entry into vehicles, and not as side protective attachments. Def. SOF, ¶ 21.

### F. Economic Practicality Of The Specified Use

Plaintiff argues that Keystone's step bars "logically spend[] more time serving a protective function rather than being a step." Pl. Reply, 28. But plaintiff fails to cite any record evidence for this conclusion, and the record lacks any probative evidence showing the economic practicality of using the step bars solely or primarily for protection.

19

### G.  Recognition In The Trade Of The Specified Use

The record shows that bars without steps are designed and used differently than bars with steps.  As we explained above in Section II.A, plaintiff's designated agent, Mr. Fabbro, testified that side bars that lack steps involve "a totally different design."  Mr. Fabbro then explained what "a totally different design" means, indicating that those bars without steps "sit[] closer to the vehicle, more for rock crawling and aggressive or more aggressive applications[,]" as compared to the step bars imported by Keystone.  Def. SOF, ¶¶ 9-10 (*see also* Def. Ex. 1, Fabbro Depo., at 23:20-22).  As such, this shows recognition in the industry of different uses for step bars versus bars without steps.

Further, Keystone describes its products as "side steps," "step bars," "steps," "step products," and "step types", particularly in marketing materials, such as on the online product page for the TrailFX A1005B.  As such, the importer's description of its own products—including in patents for substantially identical products—shows that the imported products are recognized and used in the trade as steps or apparatus for assisting with entry into vehicles.  *See, e.g.*, *Aromont*, 671 F.3d at 1316 (holding that this factor slightly favored the government given ***the importer's own description of the product*** (emphasis added)).

In sum, when the record evidence is considered in its entirety, the principal use of the class of goods at issue is not as "side protective attachments," but rather as step bars in a class of goods containing similar apparatus with step features principally used for assisting with entry into vehicles.

### III.    THE SCOPE OF AN EXCLUSION IS NOT GOVERNED BY THE PRODUCT DESCRIPTIONS IN ANY PARTICULAR REQUEST FOR EXCLUSION

As we indicated in our opening papers, pursuant to the public guidance provided to the trade community, and the general rules of statutory interpretation, "the scope of each exclusion is

governed by the scope of the ten-digit HTSUS headings and product descriptions in the Annex to this notice, ***and not by the product descriptions set out in any particular request for exclusion***." *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601 (emphasis added).  Plaintiff, however, continues to insist that the Court should consider the grant of an exclusion to Polaris, including the information and product descriptions that Polaris included in its request for an exclusion, which is directly contrary to the language of the Exclusion Notice.  *See* Pl. Reply, 7-11.  Not so. The Court must determine the applicability of the exclusion based on the language in the Exclusion Notice.  *Exclusion Extension Notice*, 85 Fed. Reg. at 48,601.

But even if the Court considers Polaris' request and the limited information available regarding that product, it is clear that Polaris' merchandise is different from the imported merchandise.  As we explained in our opening papers in Section III, the available facts— including the design, description, and marketing materials—show that the Smittybilt Side Armor's principal function is protective, and that its additional stepping function is secondary to its protective functions.  Moreover, the Smittybilt—unlike Keystone's product—lacks steps or step pads.  As such, it meets the description of "side protective attachments," because it is a side attachment for vehicles that is principally used for protection.  This stands in direct contrast to Keystone's step bars, whose principal use—including as described in patents for substantially identical products and in many of Keystone's marketing materials—is as steps for assisting entry into vehicles and whose "moderate" protective functions are secondary or tertiary.  *See* Def. SOF, ¶ 25 (*see also* Pl. Ex. B-1, at 55).

## CONCLUSION

For all the foregoing reasons, we respectfully request that the Court deny plaintiff's motion for summary judgment, grant our cross-motion for summary judgment, enter judgment

for defendant dismissing this action, and grant defendant such other and further relief as may be just and appropriate.

<div style="margin-left:40%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    /s/ Justin R. Miller
       JUSTIN R. MILLER
       Attorney-In-Charge
       International Trade Field Office

</div>

| | |
|---|---|
| *Of Counsel*: | /s/ Brandon A. Kennedy |
| Valerie Sorensen-Clark | BRANDON A. KENNEDY |
| General Attorney | Trial Attorney |
| Office of the Assistant Chief Counsel | Civil Division, U.S. Dept. of Justice |
| International Trade Litigation | Commercial Litigation Branch |
| U.S. Customs and Border Protection | 26 Federal Plaza, Room 346 |
| New York, New York 10278 | New York, New York 10278 |
| | Tel.: (212) 264-9230 |
| Dated: May 29, 2024 | *Attorneys for Defendant* |

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  HON. JENNIFER CHOE-GROVES, *JUDGE*

_____

KEYSTONE AUTOMOTIVE OPERATIONS, INC.,  :
                                       :
                            Plaintiff, :          Court No. 21-00215
                                       :
                  v.                   :
                                       :
UNITED STATES,                         :
                                       :
                           Defendant.  :
_____ :

## CERTIFICATE OF COMPLIANCE

I, Brandon A. Kennedy, a Trial Attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is the attorney responsible for Defendant's Reply Memorandum In Further Support Of Its Cross-Motion For Summary Judgment, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 6,603 words.

/s/ Brandon A. Kennedy
BRANDON A. KENNEDY